THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES SIMS, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SYLVESTER HENDERSON, Defendant-Appellant.

First District (1st Division) Nos. 84—2337, 84—2717 cons.

Opinion filed December 7, 1987.—No. 84—2337, Rehearing denied March 18, 1988.—No. 84—2717, Rehearing denied January 8, 1988.

290

James J. Doherty, Public Defender, of Chicago (Kendall Hill and James Perlman, Assistant Public Defenders, of counsel), for appellant James Sims.

Steven Clark and Bruce Mosbacher, both of State Appellate Defender's Office, of Chicago, for appellant Sylvester Henderson.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Rimas F. Cernius, and Gregory Plesha, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendants James Sims and Sylvester Henderson were charged with rape and deviate sexual assault. Simultaneous jury trials were

conducted. Sims was found guilty of rape and not guilty of deviate sexual assault. Henderson was found guilty of both offenses. Both defendants were sentenced to natural life terms. Each defendant has appealed separately. Each is represented by an attorney. Each has also filed lengthy *pro se* briefs. The appeals have been consolidated for decision.

The attorneys for both defendants contend that the State failed to prove an essential element of rape, *i.e.*, penetration, and that the Habitual Criminal Statute (Ill. Rev. Stat. 1981, ch. 38, par. 338—1 *et seq.*) is unconstitutional.

Defendant Sims' attorney also contends: the State failed to prove venue; Sims was denied his right to counsel when, after conviction and prior to sentencing and without notice to his attorney, his fingerprints were taken for the purpose of testing; and the natural life sentence was improper because the State failed to prove two prior convictions which contain the elements of a Class X felony.

Henderson's attorney also contends: Henderson is entitled to a new trial because the State improperly sought to link complainant's blood to stains found on pants taken from defendant's apartment; the State failed to tender potentially exculpatory physical evidence specifically sought by defendant's discovery request; and the prosecutor made an improper rebuttal argument.

Sims *pro se* also contends: his indictment is invalid; the evidence was insufficient as to rape, because he was found not guilty of deviate sexual assault, the verdicts being legally inconsistent; his motion to suppress and quash arrest was improperly denied; there was not probable cause for his arrest; his stop violated *Terry v. Ohio*; there was an unreasonable search and seizure in violation of the fourth amendment; the suppression of evidence denied him due process and equal protection; the State failed to list exculpatory material in response to his discovery request; the jury was improperly instructed; the State was improperly allowed to introduce evidence of other crimes; admission into evidence of the complainant's Red Cross blood donor's card was error; the admission into evidence of photocopies of his and Henderson's driver's licenses was error; the prosecutor made improper and inflammatory remarks to the jury; there was improper use of peremptory challenges by the State; it was error to refuse to excuse one juror for cause; defendant was deprived in many ways of his sixth amendment right to counsel by destruction of, or failure to preserve, exculpatory evidence and by suppression of exculpatory evidence; a police officer testified falsely; it was error to admit into evidence bloody pants and testimony regarding the blood type of the complain-

ant; his right to obtain the complainant's sexual history was unduly restricted; he was improperly denied his right to represent himself; the simultaneous trials denied him due process and equal protection; and plain error was committed when the arresting officer was allowed to testify that he gave defendant his *Miranda* rights.

Henderson *pro se* also contends: the trial court improperly denied his motion to quash his arrest and suppress evidence; his fifth, sixth and fourteenth amendment rights were violated; he was not found guilty beyond a reasonable doubt; the acquittal of his codefendant on the charge of deviate sexual assault raises a question of reasonable doubt as to his guilt on the same charge; and his constitutional rights were violated by the admission of improper evidence.

Complainant testified that in the early evening of September 21, 1983, she left her apartment on the north side of Chicago intending to walk to a bar on Clark Street to meet friends. She was abducted at knife point by Sims and forced into a car after a struggle, during which Sims threatened to slit her throat and struck her face four or five times against the pavement. Her finger was cut during the struggle. In the car another man was present. She identified that man as defendant Henderson.

She testified that she was initially placed in the front seat of the automobile between Henderson and Sims. Her cut finger bled on Henderson's pants.

Complainant testified in detail to her assault by the two offenders over the next several hours. She stated that after driving around for a time the offenders learned that she enjoyed wine and beer. They stopped and Sims went to purchase wine and beer which, complainant stated, was paid for by Henderson. Henderson stayed in the backseat with her. She asked Henderson, "[P]lease take me home *** don't hurt me, just take me home *** I won't say anything." Henderson told her, "I can promise you won't be hurt, but that doesn't mean you won't be fucked." Sims returned with beer and wine. After again driving around for some time the car was parked. Sims took complainant into the backseat and tried to force some wine down her throat. He started pulling down her pants and undergarments. She asked to be taken home and not harmed. Sims told her she "would be lucky if she saw the next day." Sims forced her to undress and performed cunnilingus on her and then forced her to perform fellatio on him.

Henderson then came into the backseat while Sims returned to the front seat. Henderson forced her into acts of cunnilingus and fellatio. She testified that the man "raped" her and tried unsuccessfully

to penetrate her anus. After a short drive he returned to the front seat. Sims came to the backseat and repeated the deviate sexual activity. Complainant testified that she was raped by Sims. Henderson was driving and at one point stopped and there was a girl who had come up to the car and said something like, "[A]re you looking for a date?" She looked in the backseat and just laughed and walked away. Henderson continued driving. He and Sims asked her "if they were driving North on Lake Shore Drive what exit would they take to get to her home?" She told them either North or Fullerton. They did not get off at either exit.

The offenders drove into a parking garage and Henderson got out of the car. Sims again got on top of her. He started talking to her, asking why she screamed and saying "[Y]ou shouldn't have screamed, if anyone ever tries to attack you again don't scream, it only makes things worse." She said nothing. Complainant then heard a commotion, heard someone yell "[G]et out of the car" and then saw a policeman pulling Sims out of the driver's side of the car. Sims was on top of her when she heard the noise and saw the police. Someone on the passenger side told her to get up and she got out of the car. When she got out, the first thing she saw was a policeman. She saw him, grabbed him and said, "Don't let them hurt me, they just raped me." The police took her to Weiss Hospital. She estimated that the time from when Sims grabbed her off the street to when the police came was four to five hours.

After she was treated at Weiss Hospital she went to the police station and talked to Detective Stone. She gave him a description of the second offender and also told him she had gotten blood on the right pant leg of his pants.

Over objection, she testified that her blood type was AB. Over additional objections a Red Cross blood donor card showing her blood type as AB was admitted into evidence. She testified that she identified defendant Henderson in a photo array presented to her on September 23 by police officer Stone. She stated that her left cheekbone was fractured. She needed four sutures in her cut finger and had cuts and bruises on both her arms and face.

Upon cross-examination she stated that it was dark outside at the time of her abduction. There were working streetlights. Henderson's name was not mentioned in the car. There were no lights on in the car except when the doors were open. Henderson looked different in a photo she viewed while she was in the hospital because in that photo he was not wearing a goatee. She also viewed his driver's license photo, in which he had a goatee. In that photo the defendant ap-

peared as he did during the incident.

Officer Lucas testified that about 2 a.m. on September 22, 1983, he responded to a radio call with his partner Officer Dorsch. They went to a parking garage near 4500 Clarendon. They observed a burgundy Buick and saw a male black jumping over a wall into an alley. Dorsch followed the man while Lucas turned his attention to the Buick. He looked in the car and saw a black male with his pants around his ankles lying on top of a white female in the backseat. At this time Officer Dorsch was returning from attempting to catch the man that fled the scene. Officer Janka also arrived on the scene.

Officer Lucas tapped on the window and told the man to pull his pants up and get out of the car. He made an in-court identification of Sims as the man in the car. Defendant Sims exited the car on the driver's side. While Officers Dorsch and Janka stayed on the driver's side, Officer Lucas walked around to the passenger side. The complainant got out of the car and grabbed the officer saying, "Please, don't let them hurt me any more." When he asked her what had happened, she told him she had been raped. Officer Lucas said her face was beaten up with cuts and bruises on it. One eye was closed. He took her back to the squad car and she grabbed his arm again and said, "Don't let him hurt me anymore." Sims was handcuffed and advised of his rights and the victim was taken to the hospital by Officer Lucas, who then returned to the scene to drive the Buick to the police station.

Officer Janka testified that he arrived at 4500 Clarendon shortly after Officers Lucas and Dorsch arrived. He observed Sims on top of complainant in the back of the Buick. He searched the Buick and found the driver's licenses of Sims and Henderson. The officer learned that the vehicle was registered to Henderson. A knife blade and a razor knife were found in the backseat. The police also determined that a Chevrolet belonging to a building resident had been jacked up and one of the tires had been removed and placed in the trunk of Henderson's car, which was only five feet away.

On cross-examination Officer Janka stated that he noted used beer cans and clothing in the car when he conducted his search. A flash message with the name and description of Henderson was put out about 15 minutes after Janka arrived on the scene. On redirect examination the witness noted that a Wild Irish Rose wine bottle and Old Style beer cans could be seen in a photograph of the backseat of the Buick.

Chicago police detective Fred Stone testified about the investigation of the offense. When Stone arrested Henderson he did not have a

goatee. Stone stated that he recovered a pair of blue jeans with a bloodstain from Henderson's apartment. On cross-examination Stone revealed that he did not specifically ask the evidence technician to test the wine bottles and beer cans for fingerprints.

Officer DeVogelear testified that in the early morning of September 22, 1983, he monitored a radio call concerning a description of the second offender. Continuing routine patrol, the officer kept his "eye out for a male black in dark clothing." At a bus stop on Sheridan Road, Montrose and Broadway, the officer saw a man he identified as Henderson. The man stated that he had been visiting friends on the north side and was waiting for a southbound bus to go to 6400 South Kenwood, where he lived. As the individual was taking out his wallet to show his identification card, the officer responded to another call without making any further investigation. Later he saw Henderson in an interview room of the police station. On cross-examination the officer stated that the man he encountered at the bus stop was "cool and calm" and acted "perfectly normal."

Officer Zefeldt, assigned to the microanalysis section of the crime laboratory, testified that after testing the evidence in the case, in his opinion sperm was present on a smear taken from the vagina of the complainant and type AB blood was on the sweatshirt recovered from Henderson's car. The pink towel, also found in Henderson's car, had AB type blood on it and the blood on the blue jeans recovered from Henderson's bedroom also tested positive for AB type blood activity. This activity was consistent with blood type AB. He said only 3% of the general population has blood type AB. He did not test the blood of the complainant or the defendant.

Jossie Wells, a co-worker of Henderson's at the American Bar Association, testified that Henderson had a small goatee when she saw him at work on September 21, 1983.

Defendant Sims testified in his own behalf and as a witness for Henderson. He admitted to being a "hustler." He tried to have sex with complainant, but claimed that her participation was consensual. He acted alone. While in the car, he and complainant drank alcohol and smoked marijuana together. They stopped at a motel at 79th and Stoney Island where Sims' brother Jerome lived. Sims wanted to use his brother's room but was unable to. He then took her back north and he talked and tried to convince her to become a lady of the street. Sims testified that he wanted her to be a lady "that caters to men like me. I'm a hustler." She said that she didn't want to engage in that type of work. Later he drove into a parking lot and Sims and complainant got into the backseat of the car. As he was fondling and

kissing the complainant the police arrived on the scene and he was arrested. At the police station he was roughed up and told to admit that Sylvester Henderson was with him during his encounter with complainant.

Sims stated that he borrowed Henderson's car on September 21 at about 8:15 p.m. because he was having car problems with his own car. Upon cross-examination Sims was impeached with numerous prior convictions.

He testified that he did not see that the complainant's eye was bruised and swollen to the point that it was closed and that it was not bruised when the police arrived. He stated that he did not do anything to her. He admitted that he talked to Henderson about this incident, but denied that Henderson was with him when he was with the complainant.

Defendant Sims denied having a knife, having sex with the complainant, putting his penis in her mouth, seeing a pink towel with blood on it in the car or seeing the complainant's cut finger.

He further testified that two driver's licenses were not found in a shirt pocket in the car; his license was in his pocket. He had no idea where Henderson's license was. He never saw a knife blade or razor knife on the floor of the car when he was in the backseat, and he never had a knife. He was only in the backseat with the complainant for 15 to 20 minutes. From the time he met complainant to the time he was arrested they were the only two people in the car.

He did not see a car jacked up near his car in the lot and he did not jack the car up. He did not know that a stolen tire was in Henderson's trunk and he only got out of the car to urinate. While in the garage he never saw another man other than the police and the security guard. His pants were not down during the evening and he was not on top of the complainant with his pants down when he was arrested.

He also testified that on September 21, 1983, he met the complainant when he picked her up while he was driving Henderson's car on the north side. He was in the car and complainant was walking on the sidewalk. He asked her if she wanted to have a drink and she replied she was going to have a drink with somebody else. He asked what she drank and she said wine and beer. He told her he could get some wine and beer and she could have a drink with him. She stopped, approached the car, looked in and then got in the car.

Sims testified that he asked her name and she told him. She also told him she was engaged to a boyfriend in Scandinavia. Sims drove to a Mini-Mart to buy a fifth of Wild Irish Rose and two six-packs of

Old Style. While he bought the liquor she sat in the car. They began to drink, and she did not like the wine because it was too sweet.

He asked where she would like to go and she said her apartment. She told him where it was, but he could not remember the address. They did not go to the apartment because they were drinking and smoking marijuana. She told him she was in Chicago visiting her brother and was staying with him, but later she said she worked here.

Sims then drove around trying to find a parking spot so they could sit, talk and finish drinking. Sims testified that he had smoked marijuana twice that night, once before he met the complainant and again when he came out of the Mini-Mart, because she told him that she does get high.

Sims further testified that he picked up the complainant at 11:30 or 12 p.m. and that she told him that if he couldn't find any place she couldn't be out too late. He then inquired as to whether she would like to engage in sex with him. Sims testified that she "didn't say yes, didn't say no, she said she just wanted to go home because it was getting late."

Veronica Henderson, defendant's wife, testified that at about 8:15 p.m. on September 21, 1983, Henderson allowed Sims to use his car. Sims drove away in the automobile. The rest of the evening was uneventful. Henderson put their three children to bed. He did not leave the house that evening. At 11 a.m. the following morning he was arrested in their apartment. Mrs. Henderson also testified that Henderson shaved about once a week. He did not have a goatee on September 21.

Antoinette Morgan, a co-worker of Henderson's at the American Bar Association, testified that she saw him at 5 p.m. on September 21, 1983. He was to give her a ride home. Sims was present, asking to borrow Henderson's car. Henderson had a goatee that day. Sims talked about a robbery.

Rudolpho Henderson, defendant's son, testified that his father was home from 7:30 p.m. until 11 p.m. on September 21, 1983. Rudolpho went to sleep at 11 p.m.

Henderson testified in his own defense. He was employed until the time of his arrest as the operator of a printing press at the American Bar Association. He is married.

On September 21, 1983, he saw James Sims. Sims was having car problems and Henderson assisted him. Henderson allowed Sims to take his car; Sims left Henderson's apartment with Henderson's Buick about 8 p.m. Henderson did not leave his apartment complex that evening.

Henderson testified that he shaved and showered that evening. He was arrested by Detective Stone the next morning. Upon cross-examination Henderson said that the pants with the blood stains were not his pants. He also denied relating certain details of his activities on the night of September 21 to Detectives Stone and Schmitt. Henderson testified that he had been arrested with Sims on a prior occasion, 14 years earlier. He had known Sims his entire life.

In rebuttal the State presented certified copies of Henderson's 1968 conviction for armed robbery and his 1972 convictions for rape, aggravated kidnapping and armed robbery. Officer Schmitt testified to impeach defendant on details of his alibi. He said that Henderson told him that the blood on his pants came from a cut on his finger.

The State also presented certified copies of Sims' 1965 conviction for rape and his 1971 conviction for rape and armed robbery.

We turn now to the various contentions made by defendants through their attorneys and *pro se.*

Defendants argue that the State failed to prove penetration—an essential element of rape. This contention is without merit. The complainant, a 26-year-old mature, intelligent adult testified that both Sims and Henderson raped her. There was no objection to her testimony.

Defendants argue that the 26-year-old complainant's testimony that she had been "raped" was insufficient to prove the necessary penetration of the female sex organ by the male sex organ.

In *People v. Thomas* (1960), 18 Ill. 2d 439, 164 N.E.2d 36, defendant objected that there was no evidence of penetration. The record showed that in answer to a question as to what happened after defendant had taken off her pants, the complaining witness testified, "He raped me." Complainant's friend who was with her testified that the defendant "put his penis in her vagina."

Justice Schaefer affirmed the conviction for rape (18 Ill. 2d at 441-42):

> "As to the testimony of the complaining witness, it is argued that in the absence of proof that the witness knew and understood the elements of the crime of rape, her testimony failed to establish penetration. And as to the testimony of [the friend] it is said that 'it smacks of rehearsal of phrases alien to his vocabulary.' Neither criticism has merit. No particular form of words is required to describe the crime or its elements. In common speech, as well as in legal terminology, the word 'rape' means sexual intercourse with a woman by force and against her consent. If there was doubt as to [the friend's] understand-

ing of the terms that he used, cross examination was available to the defendant."

■ The complainant's testimony that she had been raped by defendants was sufficient to prove penetration.

Convictions for rape were also affirmed on the ground that the use of the term "rape" was sufficient in *State v. Thomas* (1966), 248 S.C. 573, 151 S.E.2d 855, *State v. Moorer* (1963), 241 S.C. 487, 129 S.E.2d 330, *cert. denied* (1964), 379 U.S. 860, 13 L. Ed. 2d 63, 85 S. Ct. 119 (and cases therein), and *Haney v. State* (1978), 144 Ga. App. 885, 242 S.E.2d 757.

In neither *People v. Garcia* (1983), 97 Ill. 2d 58, 454 N.E.2d 274, *cert. denied* (1984), 467 U.S. 1260, 82 L. Ed. 2d 856, 104 S. Ct. 3555, nor *People v. O'Neal* (1977), 50 Ill. App. 3d 900, 365 N.E.2d 1333, did the victim testify that she was raped.

■ Defendant Sims claims that the complainant's statement to the police that she had been raped was inadmissible hearsay. We disagree. It was properly admitted either as a spontaneous declaration or as corroborative of her "Please, don't let him hurt me anymore." (*People v. Young* (1980) 89 Ill. App. 3d 333, 412 N.E.2d 167, *appeal denied* (1981), 85 Ill. 2d 574; *People v. Slavin* (1978), 66 Ill. App. 3d 525, 383 N.E.2d 1303, *appeal denied* (1979), 74 Ill. 2d 589.) Nor does complainant's failure to say anything when a girl looked in the car while Sims was in the store to get wine and beer cast doubt on her claim of rape. She was not alone; Henderson was in the car and the girl who looked in the car was obviously not a person who would be likely to help.

■ A claim is also made that the trial court erred in not instructing the jury that penetration was an essential element of rape. No such instruction was offered, nor any objection made either at the conference on instructions, at the time the instructions were given, or in a written motion for a new trial. The objection was waived. In any event, the instructions given by the court were proper and clear as to rape and proof beyond a reasonable doubt.

Defendant Sims argues that defendant's life sentence must be vacated because the Habitual Criminal Statute (Ill. Rev. Stat. 1981, ch. 38, par. 33B—1) was improperly amended in 1980 in violation of article IV, section 8(d), of the 1970 Illinois Constitution. Ill. Const. 1970, art. IV, §8(d).

Defendant did not raise this issue below, either at the sentencing hearing or in his written motion for a new trial or in the argument on that motion. The issue, then, can be considered waived. In any event, however, the amendment has been upheld in *People v. Cannady*

(1987), 159 Ill. App. 3d 1086, 513 N.E.2d 118.

■ Defendant Henderson also argues that section 33B—1 of the Habitual Criminal Statute, by requiring the imposition of life imprisonment and by forbidding the consideration of the offender's personal characteristics and the seriousness of the offense, violates article I, section 11, of the 1970 Illinois Constitution, which provides: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." He further contends that by preventing the consideration of any mitigating evidence, the statute also violates due process of law under the Illinois State Constitution.

In *People v. Withers* (1983), 115 Ill. App. 3d 1077, 450 N.E.2d 1323, *cert. denied* (1984), 465 U.S. 1052, 79 L. Ed. 2d 726, 104 S. Ct. 1332, this court rejected the argument that the statute improperly precluded consideration of mitigating facts. Defendant contends that *Solem v. Helm* (1983), 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001, undercuts *Withers*. We disagree.

Henderson was convicted of two separate Class X felonies before his conviction for Class X felonies in the case at bar. In 1968 he was convicted of armed robbery and in 1972 of rape and armed robbery. These prior convictions make *Solem v. Helm* inapplicable. In that case the prior offenses involved were nonviolent. Here the prior offenses were violent and the punishment, therefore, was not disproportionate to the crimes for which defendant was convicted in the case at bar. See *People v. McNeil* (1984), 125 Ill. App. 3d 876, 466 N.E.2d 1058, which held *Solem v. Helm* inapplicable on the ground that the prior offenses, as here, were violent.

Further, the Habitual Criminal Statute does not violate the eighth amendment to the United States Constitution, or deny due process in violation of the fifth and fourteenth amendments to the United States Constitution. It has been upheld many times: *People v. Morissette* (1986), 150 Ill. App. 3d 431, 501 N.E.2d 781, *appeal denied* (1987), 114 Ill. 2d 554; *People v. Cannon* (1986), 150 Ill. App. 3d 1009, 502 N.E.2d 345; *People v. Boswell* (1985), 132 Ill. App. 3d 52, 476 N.E.2d 1154, *rev'd on other grounds* (1986), 111 Ill. 2d 571; *People v. Hartfield* (1985), 137 Ill. App. 3d 679, 484 N.E.2d 1136, *appeal denied* (1986), 111 Ill. 2d 575; *People v. Washington* (1984), 125 Ill. App. 3d 109, 465 N.E.2d 666, *appeal denied* (1984), 101 Ill. 2d 586; *People v. Tobias* (1984), 125 Ill. App. 3d 234, 465 N.E.2d 608, *appeal denied* (1984), 101 Ill. 2d 576; *People v. Withers* (1983), 115 Ill. App. 3d 1077, 450 N.E.2d 1323, *cert. denied* (1984), 465 U.S. 1052, 79 L. Ed. 2d 726, 1045 S. Ct. 1332; *People v. Mason* (1983), 119 Ill. App. 3d 516,

456 N.E.2d 864, *appeal denied* (1984), 99 Ill. 2d 532.

Nor does it deny due process under article I, section 2, of the 1970 Illinois Constitution. *People v. Clark* (1986), 144 Ill. App. 3d 420, 494 N.E.2d 551; *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 480 N.E.2d 1147, *cert denied* (1986), 475 U.S. 1089, 89 L. Ed. 2d 731, 106 S. Ct. 1476; *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059.

Defendant further argues that the Habitual Criminal Statute gives the prosecutor absolute discretion as to whom he wishes to sentence to life imprisonment and thus is in violation of the separation of powers provision of the 1970 Illinois Constitution (Ill. Const. 1970, art. II, §1). This contention has been rejected. *People v. Wilson* (1985), 139 Ill. App. 3d 726, 487 N.E.2d 1015, *appeal granted* (1986), 112 Ill. 2d 567; *People v. Washington* (1984), 125 Ill. App. 3d 109, 465 N.E.2d 666; *People v. Withers* (1983), 115 Ill. App. 3d 1077, 450 N.E.2d 1323, *cert. denied* (1984), 465 U.S. 1052, 79 L. Ed. 2d 726, 104 S. Ct. 1332.

See also *People v. Taylor* (1984), 102 Ill. 2d 201, 464 N.E.2d 1059, in which the court held that the statutory provisions for a sentence of natural life imprisonment upon conviction of murdering more than one victim do not unduly infringe upon the judicial power and do not violate article II, section 1, of the 1970 Illinois Constitution. 102 Ill. 2d at 205-06.

Defendant Sims contends that his mandatory natural life sentence must be reversed because the State did not prove two prior convictions containing the elements of a Class X felony. The statute requires two former convictions which contain "the same elements as an offense now classified in Illinois as a Class X felony." (Ill. Rev. Stat. 1985, ch. 38, par. 33B—1.) Defendant admits that his 1972 conviction was a Class X felony, but claims that his 1965 conviction for rape was not because of the 1984 amendment to the statute. He argues that because the elements of rape in the 1965 statute (*i.e.*, sexual intercourse *** by force and penetration) are now, under the 1984 amendment, the definition of sexual assault, which is a Class 1 felony (Ill. Rev. Stat. 1985, ch. 38, pars. 12—13(a)(1), 12—13(b)), the State failed to prove that the 1965 offense contains the same elements as an offense now classified as a Class X felony. His claim is without merit.

The present act specifically provides: "The abolition of any offense by this Act does not affect any *** penalty, punishment *** or remedies accrued under any law in effect immediately prior to the effective date of this amendatory Act of 1983, which related to the abolished offense. *** This *** Act *** shall only apply to those persons who commit offenses prohibited under Sections 12—13 through 12—16

of the Criminal Code of 1961, as amended, on or after the effective date of this amendatory act. \*\*\* This Act shall take effect on July 1, 1984." Pub. Act. 83—1067, §27, eff. July 1, 1984.

■ Claims similar to the one raised here have been rejected in *People v. J.S.* (1984), 103 Ill. 2d 395, 469 N.E.2d 1090 (deviate sexual assault), *People v. Kiner* (1986), 143 Ill. App. 3d 366, 493 N.E.2d 345, *appeal denied* (1986), 112 Ill. 2d 586 (attempt to change rape, a Class X felony, to criminal sexual assault, a Class 1 felony, for the purpose of sentencing), and *People v. Flambeau* (1985), 134 Ill. App. 3d 932, 481 N.E.2d 740, *appeal denied* (1985), 111 Ill. 2d 558 (indecent liberties with a child). The new act applies only to those who commit offenses on or after July 1, 1984. The 1965 conviction contained the *same* elements as a Class X felony.

Defendant Sims claims that he was denied his right to counsel when his fingerprints were taken without his counsel's being present. He points to Rule 413(b) which, he says, requires that his counsel be notified so that he may be present when he is fingerprinted. He also relies on *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, and *People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40.

Defendant admitted that he had been convicted of rape in 1971. In addition, the State presented certified copies of his 1965 conviction for rape, his 1971 conviction for rape and armed robbery and testimony concerning those convictions. There was also testimony that the fingerprints on the 1965 and 1971 cards were identical. The new fingerprints matched both cards.

■ Defendant argues that because the State had to prove two previous Class X felonies in order to impose a natural life sentence and defendant denied one of those convictions, taking his fingerprints without notice to his counsel, in order to show that they matched the prints in that earlier conviction, denied him the right to counsel at a critical stage. This, he argues, requires a vacation of his sentence and remandment for resentencing. We disagree.

It is not clear that Rule 413 applies to this matter. The rule is concerned with discovery, which is before trial. Here the trial had been concluded and defendant had been convicted. In addition, both cited cases are distinguishable. Neither dealt with fingerprints and both were pretrial and concerned a preindictment showup and a pretrial photograph. Finally, there is no showing of prejudice to defendant. How counsel's presence would have had any effect on the taking of fingerprints is not described. The taking of fingerprints is a simple act. There is no showing that the wrong person was identified. It

would also appear that, under the reasoning of *Gilbert v. California* (1967), 88 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, the taking of defendant's fingerprints was not at a critical state.

■ Defendants contend that the record fails to show that the offenses took place in Cook County and that, thus, venue was not proved. We disagree.

The complainant testified that she lived in Chicago, Cook County, Illinois, and resided at 2048 North Cleveland on the day of the incident. She said she was walking to a bar four blocks from her home when she was abducted off of the street by the defendants. She testified that the defendants drove around and stopped at a liquor store. During periods of driving the car, stopping, and switching places, the defendants took turns raping her and forcing her to perform oral sex on them. They also performed oral sex on her.

The defendants asked her "if they were driving North on Lake Short Drive what exit [they would] take to go to her home." She responded, but they did not get off at the exits she told them. They continued to drive and asked her where Wilson and Lawrence avenues were. The complainant told them they were north of her home. They then pulled into an apartment building garage.

Testimony from Chicago police officers indicated this garage was located at 4500 North Clarendon in Chicago. It was at this address that defendant Sims was arrested, defendant Henderson fled and the complainant was rescued. She was then taken to Weiss Hospital and then to a Chicago police station.

The complainant's testimony sufficiently proved venue in this case. *People v. Barksdale* (1974), 24 Ill. App. 3d 489, 321 N.E.2d 489, *appeal denied* (1974), 55 Ill. 2d 602, is factually similar. There the victim testified that she was walking down Sheridan Road in Chicago at approximately 4 a.m. when the defendant hit her and dragged her into his car. He pushed her onto the floor of the backseat and drove until approximately 6:10 a.m. He stopped the car in an area the victim could not identify and raped her and forced her to perform oral sex on him. Defendant also performed oral sex on her. The defendant then drove complainant to an alley and dropped her off in Chicago. The defendant told the victim during the return trip they were several minutes from the city. This court held that the evidence of her abduction in Chicago and her release in Chicago sufficiently established venue beyond a reasonable doubt. (24 Ill. App. 3d at 497.) Similarly, in this case, the evidence establishes venue beyond a reasonable doubt. The victim testified she was abducted in Chicago and ultimately released in Chicago. There is no evidence that defendants took

the victim from the city. In fact, her testimony that the defendants asked for directions for an exit "if" they were driving north on Lake Shore Drive and asked where Wilson and Lawrence avenues were strongly supports the inference that they in fact never left the city of Chicago. A court may take judicial notice of street addresses or landmarks to establish venue. (*People v. Luigs* (1981), 96 Ill. App. 3d 700, 702, 421 N.E.2d 961, *appeal denied* (1981), 85 Ill. 2d 571.) All of the above streets are in Chicago.

In addition, defendant Henderson was not denied a fair trial because the court did not instruct the jury that the People were required to prove venue. He requested no such instruction, nor did he raise the question in his motion for a new trial. His contention is waived. Further, even if his claim is considered, it is harmless error because venue was proved.

Defendants argue that the State improperly introduced the complainant's blood type into evidence and then improperly argued that the blood type matched blood found on Henderson's clothes. We disagree.

Complainant testified that she was cut on the finger when she struggled with defendant Sims and that her cut finger bled on defendant Henderson's pants. She also testified over objection that her blood type was AB and introduced into evidence, over objection, her Red Cross blood donor card stating that her blood type was AB. The State's microanalyst testified that his examination of the pants found in Henderson's apartment revealed a human blood stain showing A and B activity and that 3% of the population have type AB blood. AB blood was also found on the victim's sweatshirt and a towel.

■■ Defendants contend that the victim's testimony and the Red Cross card were hearsay and, thus, improperly admitted; the card, because it was not authenticated; the testimony, because it consisted only of what someone had told her.

The possession by complainant of a Red Cross blood donor card showing her blood type as AB was not hearsay evidence. (*Thomas v. State* (Fla. 1969), 223 So. 2d 318, 323.) It is common knowledge of which this court takes judicial notice that the blood typing stated on a Red Cross blood donor's card is relied on by those in the medical profession both when giving a blood transfusion to, and when taking blood from, a card holder. It contains its own substantial assurance of trustworthiness. The admission of the card was not error, nor was the complainant's reliance on it when she stated that her blood type was AB.

■■ Henderson further claims prejudice because he became aware

of the Red Cross donor's card for the first time at trial. The record refutes this claim. The card was one of the many pieces of physical evidence listed in laboratory reports tendered to defense counsel in discovery. If he had been caught by surprise, he could have requested a continuance to investigate the card. He did not. There was no prejudice.

Defendant further argues that it was error to allow the microanalyst to testify that 3% of the population have AB blood and to allow the prosecutor to argue that it was not a coincidence that the blood on defendant's pants and complainant's blood were both AB type. He contends that this type of argument was held to be plain error in *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, and that defendant is entitled to a new trial.

In *Harbold*, the evidence was close and "entirely circumstantial." The court held that the evidence as to the blood stains was admissible, but that the statistical probability of matching blood constituted plain error in light of the "closeness of this circumstantial case." (124 Ill. App. 3d at 378-83.) *Harbold* has no application because the evidence here was neither close nor entirely circumstantial.

Further, because defendant made no objection to the microanalyst's testimony or to the prosecutor's argument and did not raise the issue in his motion for a new trial, the contention is waived. But even if not, it is without merit.

■■■ Henderson also argues that he was deprived of a fair trial because the People failed to produce his alleged exculpatory statement prior to trial. The record shows that he did have notice of it before trial. It was in the police report and other materials given him in discovery. He was well aware of its existence and was not prejudiced. In addition, he neither objected to the police officer's testimony regarding the statement, nor raised the issue in his motion for a new trial.

Sims' contention that the State failed to provide Henderson's claimed exculpatory statement prior to trial and that this failure hampered his trial strategy and deprived him of a fair trial is not borne out by the record, which shows that this statement was in police reports and other materials given to defendant in discovery and that he was aware of this statement and was not prejudiced in any way.

Henderson also contends that he should be given a new trial because the prosecutor made an improper rebuttal argument. We disagree.

Because no objection was made at the time of the comment or in defendant's motion for a new trial, the issue was waived. But even if

not waived, it was not so prejudicial as to require a new trial.

In his closing argument Henderson's attorney contrasted his client with codefendant Sims. He asked the jury to look at the defendant's appearance, hair, clothing, personality and marital status. He called the jury's attention to the fact that Henderson was married with a family, but that he didn't know about Sims. Henderson was employed, but Sims wasn't. Henderson was intelligent, articulate and a worker, while Sims acted as if the world owed him a living and life of pleasure, while Henderson's attitude was that he had to work for what he wanted and earn a living to provide for his family. He then said, "I think that there are some stark kinds of comparisons that can be made between the two parties, and the question that I think you ought to ask yourselves is how in the world could a man of Mr. Henderson's caliber have been involved with Mr. Sims, particularly in a situation that has been described to you. I would submit to you, ladies and gentlemen, that he was not involved."

The prosecutor responded during rebuttal: "By the way, I am a little surprised that Henderson's attorney said this but he did say it, how could someone like Mr. Henderson be involved with Mr. Sims in something like that? Did you hear that? Well, we all know that in 1971 he was involved in the same thing with his buddy just like this. Sure, it's been fourteen years, Sims has only been out of the penitentiary for six weeks. That's right, six weeks, Sims· has been out for six weeks, his buddy."

Henderson and Sims had been arrested in 1971. In 1971, Sims was convicted of rape and armed robbery. In 1972, Henderson was convicted of rape, aggravated kidnapping and armed violence. Henderson was Sims' friend and had been all his life. Sims was paroled on August 4, 1983, after serving 11 to 12 years and had only been on the street for six or seven weeks when the incident here involved occurred. Henderson was with Sims about 5 p.m. that day.

■ The comment made was in response to and invited by the argument of Henderson's counsel. It was based on evidence before the jury. Both defendants in 1971 had been involved in rape, aggravated kidnapping and armed violence. Because they were friends, it was a permissible inference that they had been together in the 1971 offenses. But if not, any error was harmless because of the complainant's positive identification of Henderson as a participant in the incident now before the court.

In addition, the prosecutor explicitly stated that defendant's 1971 conviction was only to be considered to judge his credibility and the trial judge specifically instructed the jury that a conviction is to be

considered only for believability. Whatever prejudice had been created by the prosecutor's comment was thus lessened. *People v. McKinney* (1983), 117 Ill. App. 3d 591, 597, 453 N.E.2d 926, *appeal denied* (1983), 96 Ill. 2d 563.

The comment was one of many made in a lengthy rebuttal argument. The evidence presented at trial against the defendant was overwhelming. This evidence consisted of an unimpeached, clear identification of the defendant as one of the complainant's rapists. This alone was sufficient to convict the defendant. This eyewitness testimony, however, was not the only evidence against defendant Henderson. The crime was committed in his car, his driver's license was found on the scene, after he fled a Chicago police officer saw him nearby waiting for a bus, and evidence also showed that he shaved his goatee in order to change his appearance. Also, the victim testified that she bled on defendant's pants, and blood was found on defendant's pants. This evidence, combined with the fact that the jury was properly instructed by the judge to disregard any argument not based on the evidence, demonstrates that any alleged error was harmless. *People v. King* (1979), 67 Ill. App. 3d 754, 758, 384 N.E.2d 1013.

Turning to the multitude of defendants' remaining *pro se* arguments, we have carefully examined them and find that they are without merit or amount to such minor matters as not to constitute reversible error.

The indictment was sufficient: It clearly informed defendant Sims of the offense, the elements of the offense and acts he was accused of committing. The trial court correctly denied his motion for a directed verdict.

■■■ The acquittal of defendant Sims of the charge of deviate sexual assault does not cast doubt on his conviction for rape. Rape was proved. Deviate sexual assault requires completely different acts. Rape requires penetration; deviate sexual assault requires an act of sexual gratification. Verdicts of guilty of rape and not guilty of deviate sexual assault are not inconsistent and do not cast doubt on the rape conviction. *People v. Jennings* (1986), 142 Ill. App. 3d 1014, 1033, 492 N.E.2d 600, *appeal denied* (1986), 112 Ill. 2d 586.

The police had probable cause to arrest defendant for rape when they saw him on top of the complainant with his pants down and complainant immediately complained that defendant raped her.

■■■ Defendant Henderson contends that the State's failure to submit certain items sought by discovery entitles him to a new trial. We disagree.

He filed two motions for discovery asking for, among other

things, a list of all physical property in the possession of law enforcement officials and any reports of tests made by experts as to fingerprints. The State filed its answer to discovery listing several specific items, but made no mention of a jack, tire or tools or of a wine bottle or beer cans; and, as to tests and experts, stated that it was unaware of any evidence which might be favorable to the defense. Subsequently, defendant filed a motion to compel the State to comply with the motion for discovery. In it he also asked that the State be ordered to bring into court the jack, tools and vehicle tire and all alcohol beverage bottles and cans. He also requested all records made by law enforcement authorities pertaining to this property, including fingerprint comparison tests. After verdict, defendant filed motions for a new trial. One ground was the failure of the State to list and preserve the tire and beer cans to test for fingerprints. The motions were denied.

Sims contends that the items sought had a potentially exculpatory value and that the State's failure to respond to these requests and to tender the requested items to the defense violated *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and necessitates a new trial.

To establish a *Brady* violation, a defendant must show that the evidence actually existed, that it was in the possession of the prosecutor, that it was favorable to defendant, and that the prosecutor failed to disclose this evidence in response to a specific request.

Here the record does not disclose that the items were ever in the possession of the prosecutor. In fact, the testimony at the trial was unequivocal that the wine bottle and beer cans were never inventoried. Where there is no evidence that the State or its agents possessed the items, the State cannot be accused of withholding evidence. (*People v. Spurlark* (1979), 74 Ill. App. 3d 43, 57, 392 N.E.2d 214.) The State here tendered defendant everything it had in its possession.

If these items were available, and if defendant's fingerprints were on them, that evidence would be highly inculpatory. Defendant's claim of possible exculpatory value is apparently based solely on the fact that the items are not available; thus the inculpatory nature of any fingerprints on them could not be shown. Defendant's argument is advanced in the face of the complainant's positive identification of him.

*People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40, and *People v. Loftis* (1977), 55 Ill. App. 3d 456, 370 N.E.2d 1160, are inapplicable. In both, the State refused to tender evidence actually in its possession.

Sims claims the court committed reversible error because it

refused to answer a question from the jury. The record discloses that the question from the jury which was trying Sims was asked while the judge was presiding at the final argument before the jury trying Henderson and that, before the court could consult with Sims' attorney and respond to the question, the Sims jury had reached a verdict. Those facts were put into the record by the trial judge with the agreement of all parties. No error was committed.

██ Sims contends that he was forced to defend against accusations of auto tampering without advance notice. There is no merit to this contention. The complainant testified to the rape and sexual actions by defendant. Testimony by the police officers that they came to the scene in the garage to investigate a report by the garage's security guard of auto tampering was merely an explanation of why they came to the garage. This evidence was admissible as relevant to the police investigation of the offense at issue where such investigatory procedures involved an integral part of the narrative of the arrest. There was never a charge, let alone a conviction, of auto tampering. Defendant was not forced to defend against any such charge.

██ Sims argues that the search of Henderson's car at the scene of Sims' arrest was improper as a violation of the fourth amendment.

Henderson, not Sims, owned the car. Sims, therefore, lacked standing to contest the search. In addition, Henderson abandoned his car and Sims cannot complain that the police searched it. (See *People v. Embry* (1973), 12 Ill. App. 3d 332, 336, 297 N.E.2d 604.) Further, the search was proper because the police were attempting to determine ownership of the car.

They saw Sims lying on the complainant and heard her outcry that she had been raped. Consequently, they had probable cause to believe the car contained evidence of the crime. The license plate number could not be checked for ownership because the computer was not working—they searched the car and found the defendant's and Henderson's driver's licenses. The search was proper. *People v. Brown* (1967), 38 Ill. 2d 353, 358, 231 N.E.2d 577.

██ Sims' claim that he was denied a right to a trial by a jury comprised of a cross-section of the community because the State used its peremptory challenges to exclude potential black jurors solely because of their race is without merit. The record does not show that defendant's counsel objected to the use of peremptory challenges, nor does it indicate the race of the prospective jurors, of those selected and of those excluded. The State used only four challenges, to none of which did defendant's counsel object. Further, defendant's failure to make a complete record of the *voir dire* and of the race of the pro-

spective jurors chosen and excluded constitutes a waiver of the issue. *People v. Mitchell* (1987), 163 Ill. App. 3d 58.

He asserts that the trial court's refusal to exclude for cause a prospective juror who had been a rape victim deprived him of a fair trial because it forced him to use a peremptory challenge. This claim also lacks merit. The juror stated that she could give defendant a fair trial. The trial judge in his discretion found she could not be removed for cause. Defendant then exercised his final peremptory challenge.

He contends that his sixth amendment right to counsel was violated when the court released Henderson's car to Henderson's wife without notice and in absence of counsel. The supplemental record, however, shows that Sims was in court represented by counsel when the car was released. His counsel did not object.

Sims argues that the State withheld exculpatory evidence from him. The record, however, shows that the State properly complied with all defense discovery requests and furnished him everything in its possession. A semen typing test was not conducted; consequently, there was no suppression of the sperm blood type from defendant. The absence of such evidence did not prejudice defendant unfairly when he was seen lying on top of the complainant with his pants down and the complainant, after his removal, told police that he had raped her.

Sims' argument that his conviction was based on the State's use of perjured testimony has no foundation in the record. The testimony of the police as to why they were at the scene of the arrest was truthful.

Sims further complains that the search of Henderson's house and the seizure of Henderson's pants was illegal and that the court's denial of Henderson's motion to suppress evidence was incorrect. Sims lacks standing to raise this issue because it does not affect his rights. Fourth amendment rights are personal rights and cannot be asserted vicariously. (*Rakas v. Illinois* (1978), 439 U.S. 128, 138-40, 58 L. Ed. 2d 387, 397-99, 99 S. Ct. 421, 427-28.) In addition, he does not show how the claimed violation affects him. Sims made no motion to suppress Henderson's pants; nor did he raise the question in his post-trial motion.

He also contends that he was improperly denied cross-examination of the complainant as to her sexual history. The trial court, in conformity with the statute, ruled correctly. Ill. Rev. Stat. 1983, ch. 38, par. 115—7; *People v. Cornes* (1980), 80 Ill. App. 3d 166, 175-76, 399 N.E.2d 1346, *appeal denied* (1980), 81 Ill. 2d 585.

Sims claims that he should have been allowed to represent

himself and that the claimed denial prejudiced him because it violated his right to a fair trial and impeded his speedy trial rights. The record shows that he was not denied a right to represent himself; he refused to cooperate with his second attorney and later obtained the services of a third attorney, who represented him at trial. He was not denied the right to a speedy trial.

Sims further asserts that the court erred in not giving the entire circumstantial evidence instruction. There was no error because there was both direct and circumstantial evidence of defendant's guilt.

He contends that the State improperly used hearsay testimony of an unidentified security guard in the garage to identify defendant as the perpetrator of the rape and other offenses. There was no error—the evidence and comments on it were all part of the proper showing as to how the police came and arrested defendant. Further, defendant's identification was not in issue as he was caught in the act.

Sims contends that the court, in allowing simultaneous jury trials, denied him a fair trial because his jury was not allowed to hear Henderson's case and Henderson's cross-examination. This, he contends, deprived him of a fair trial because, since Henderson's jury had his (Henderson's) entire case, his (Sims') jury should have been able to hear Henderson's entire case, including Henderson's alibi. This argument is unpersuasive. Sims asked for a severance. Had he wanted his jury to hear Henderson's alibi he could have simply agreed to a joint trial. Simultaneous juries are permissible where a defendant is given the opportunity to present his defense to his jury. (*People v. Johnson* (1986), 150 Ill. App. 3d 1075, 1089, 502 N.E.2d 304, *appeal denied* (1987), 113 Ill. 2d 580.) Defendant was not prejudiced.

Defendant contends the trial court improperly allowed the arresting officer to testify that defendant was given his *Miranda* rights. He claims that the testimony prejudiced him because the jury was left to speculate that he had remained silent, and from that speculation the jury might have drawn an impermissible inference or, conversely, the jury might have conjectured that he made an exculpatory statement which the State chose not to introduce as evidence. There is no merit in this claim. The officer was simply asked one question—whether Sims was advised of his constitutional rights. No adverse evidence could arise from this single question; nothing further was said.

We find that defendant Sims was properly found guilty beyond a reasonable doubt. His conviction and sentence are affirmed.

Defendant Henderson contends that his conviction for deviate sexual assault must be set aside because his codefendant was acquitted of deviate sexual assault. We disagree.

There were two separate juries—although both heard the same evidence as to certain aspects of the case, each alone heard evidence applicable to one defendant only. The evidence as to deviate sexual assault was not identical as to each defendant. Each defendant presented a different defense: Sims, consent; Henderson, alibi. Consequently, the finding by Sims' jury of not guilty of deviate sexual assault does not raise any doubt as to Henderson's guilt on that charge. (*People v. Gharst* (1984), 122 Ill. App. 3d 1, 5, 460 N.E.2d 813.) All trials are *sui generis*. (*People v. Montgomery* (1986), 141 Ill. App. 3d 428, 436, 490 N.E.2d 206, *cert. denied* (1986), 479 U.S. 866, 93 L. Ed. 2d 151, 107 S. Ct. 224.) Sims' acquittal "may simply have been the result of the jury's exercise of its 'historic power of lenity.' " *People v. Dawson* (1975), 60 Ill. 2d 278, 281, 326, N.E.2d 755, *cert. denied* (1975), 423 U.S. 835, 46 L. Ed. 2d 54, 96 S. Ct. 61; *People v. Harris* (1982), 104 Ill. App. 3d 833, 840, 433 N.E.2d 343, *appeal denied* (1982), 91 Ill. 2d 575.

 Henderson contends that the police lacked reasonable cause to arrest him. The record shows that the police had ample grounds.

The victim was raped by two men. She and Sims were found in Henderson's car. The police found Henderson's driver's license in the car. The victim described the second man who fled and her description matched both the description of Henderson and his picture on his driver's license. He was identified in an ownership search as the car's owner. These facts viewed objectively were sufficient to warrant a man of reasonable caution to believe Henderson committed the crime and to constitute probable cause to arrest him. (*People v. Jones* (1983), 114 Ill. App. 3d 576, 582, 449 N.E.2d 547.) The police proceeded to his home, where they arrested him.

 The evidence also shows that there were exigent circumstances which made the warrantless arrest proper. The arresting officers knew that a serious, violent offense was involved and that a weapon was used in the commission of the offense. The victim was abducted at knifepoint, forced into Henderson's car and then subjected to a four- or five-hour ordeal during which she was repeatedly raped and forced to submit to and perform deviate sexual acts. The police checked Henderson's background. This revealed two previous armed robbery convictions. The police had reason to believe he was armed and dangerous. The officers clearly had probable cause to arrest him. The officers knew that he was on parole for a rape with almost identical facts and that, therefore, he had every reason to try and escape. They were told by his wife he did not go to work and he was home that day. The defendant's wife then allowed the officers to

enter the apartment, and thus the entry was peaceful. There was no inordinate delay in which time a warrant could have been obtained. Detective Stone testified he arrived at Henderson's home at about 12:15 p.m., 8 to 10 hours after the incident. In this time Detective Stone compiled information on the case and this information gave the police probable cause to arrest Henderson. He then drove to Park Forest, went to the Park Forest police station to inform them of the facts of this case, and then went to his house with the Park Forest police. The police had good reason to expect that he was on the premises since it was shortly after the crime and this was his home. They knew he was dangerous and had an excellent reason to flee. In determining whether law enforcement officials acted reasonably, courts should judge the circumstances as known to officials at the time they acted. (*People v. Abney* (1980), 81 Ill. 2d 159, 173, 407 N.E.2d 543.) The officers acted quickly and reasonably and the trial court correctly ruled that exigent circumstances existed.

Two of the arresting officers, Detective Stone and Park Forest Officer Hamilton, testified that Henderson's wife consented to their entry into the apartment. Her testimony to the contrary was not believed by the jury. When consent is given to enter one's residence and an arrest is effected based upon probable cause, a defendant's rights under the fourth amendment are not violated, even in the absence of exigent circumstances. (*People v. Bean* (1981), 84 Ill. 2d 64, 69-70, 417 N.E.2d 608, *cert. denied* (1981), 454 U.S. 821, 70 L. Ed. 2d 93, 102 S. Ct. 106.) It was proper for Detective Stone of the Chicago police department to arrest the defendant in Will County because he had probable cause to believe the defendant committed an offense in Chicago. *People v. Durham* (1979), 71 Ill. App. 3d 725, 726-27, 390 N.E.2d 517.

We find that Henderson was properly found guilty beyond a reasonable doubt. His convictions and sentences are affirmed.

84—2337, Affirmed.

84—2717, Affirmed.

CAMPBELL and BUCKLEY, JJ., concur.