THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ERNEST CORNES, Defendant-Appellant.

Fifth District   No. 78-348

Opinion filed January 7, 1980.

Richard J. Wilson and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

Robert H. Howerton, State's Attorney, of Marion (Raymond F. Buckley, Jr., and Ann E. Singleton, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Arthur J. O'Donnell and Sheila Murphy, both of O'Donnell & Murphy, of Chicago, and Julie A. Gorman, law student, for *amici curiae* National Organization for Women and American Association of University Women.

Mr. JUSTICE KARNS delivered the opinion of the court:

Following a jury trial in the Circuit Court of Williamson County, defendant, Ernest Cornes, was convicted of rape, deviate sexual assault and intimidation and sentenced to concurrent terms of imprisonment of 60 years for rape, 60 years for deviate sexual assault and 10 years for intimidation. The trial court ordered the sentences to run consecutive to a 1-year to life sentence on which defendant had been paroled. From his conviction and sentence defendant appeals.

Complainant testified that she lived in an apartment in Cambria, Illinois, with her 11-year-old son, Matthew. At approximately 3 a.m. on

October 11, 1977, she was awakened by a knock at her door. She turned on the porch light, looked out the peephole of the door and saw defendant, who lived across the street from her. Complainant explained that she and defendant's family had been neighbors for two years. She visited with Mr. and Mrs. Cornes frequently and babysat for their son. The two families went on picnics and ate meals together on several occasions. Defendant had repaired complainant's television set and had given her a ride to Carbondale when she had car trouble.

Complainant asked defendant what he wanted and he told her that his wife was ill and they needed help. She then put on her quilted bathrobe and let defendant in the door. After defendant sat down on the couch, complainant asked him what was wrong with his wife. He replied that there was nothing wrong and stated that he wanted to make love to complainant and that he needed her. She told him that she did not want to make love; that she was not attracted to him; and that he should think about his wife and not hurt her. He responded, "I am going to make love to you. If you don't make love to me, I am going to kill you." She believed he was serious and began to scream hoping that someone would hear her and that defendant would leave. At that point, her son came into the room. She went over to her son and demanded that defendant leave the premises. Defendant refused to leave, hit complainant on the face and told the boy to go to the bedroom. Complainant ran into the bedroom to make a telephone call to defendant's wife, but defendant came in after her and disconnected the phone. She called to her son and sat with him on the edge of the bed with her arms held tightly around him. Defendant stood over them and said, "Matthew, I'm going to tell you just exactly what your mother is. * * * Matt, your mother is a whore. She's a slut and she uses men to run over you with." Defendant put his fist by complainant's jaw and added, "Matt, if you don't leave the room, I'm going to break your mother's jaw." Matthew left the room and complainant attempted to make another telephone call, which defendant once again disconnected. When defendant told her to remove her robe, she began to scream. After threatening her again, he told her to lay on the bed and spread her legs. Complainant complied with his demands for fear of her life. Defendant stood over her and said, "You're ugly. You're pathetic. You're nothing but trash. You're prejudiced. I don't even want you. You could have had a good thing with Willie but you said that you didn't date blacks." Defendant then removed his clothing and demanded that they have intercourse. Complainant started crying and feared for the safety of herself and her son. Thereafter, defendant forced her to place his penis in her mouth and have intercourse with him twice. Complainant begged him to stop and submitted to the demands only because she was afraid. During the course of these events, defendant continued his verbal

abuse of complainant. Defendant then got dressed and told her to go to the living room. There he demanded that she embrace him before he left and told her that she "better not report him" because if she did he would kill her. He added that he would be watching every move she made; that he was her master; that she would have to submit to all his demands; and that if she did not comply with these demands he would kill her.

After defendant left, complainant called a friend, told him what had happened, and took a bath. She told her son not to go to school because she was afraid defendant might try to approach and threaten him. Complainant went to work but could not stop crying. She spoke to a co-worker about the incident and called the Women's Center in Carbondale. Complainant went to the hospital where she was met by Kathy Stathos, a counselor at the Women's Center. An examination revealed the presence of nonmobile spermatazoa and a bruise on complainant's thigh.

Complainant further testified that she has not lived in the apartment since the incident. She apparently stayed at the Women's Center until she found a new home and an adult female roommate.

Kathy Stathos testified that she received the phone call from complainant. She met complainant at the hospital and described her as being visibly shaken and very upset. She stayed with complainant throughout the medical examination and accompanied her to the apartment where complainant took some of her belongings.

Matthew, the 11-year-old son, testified that on October 11, 1977, he was awakened by a knock at the door. He then heard defendant enter the apartment and talk to his mother. Matthew got out of bed and saw defendant standing in the hallway. He saw his mother attempt to call the police and defendant disconnect the receiver. According to Matthew, defendant held his fist to his mother's jaw and threatened to break it if she did not tell Matthew to return to his room. Matthew was frightened and went back to his room because he did not want his mother to be hurt.

On cross-examination, Matthew testified that he did not see defendant hit or hurt his mother. He heard defendant tell his mother that she was "not good." After Matthew went to bed, he also heard his mother scream.

Defendant testified that he first met complainant in 1973 when he was dating one of her co-workers. After discovering that they were neighbors, the two families would go on picnics, have cookouts, ride bikes around the neighborhood and get together for dinner. Defendant stated that he and complainant were becoming closer friends as time went by and that she would call him on the telephone and ask him for "help, advice or even sometimes protection." He added that at various times he saw her and "her escort" at a local night club, where defendant worked as an assistant manager and bouncer, and on occasion would dance with her.

Defendant testified that on the evening of October 10, 1977, he and some friends went drinking. He returned home at approximately 3:30 a.m. and noticed a light in complainant's apartment. After parking the car, he went to her apartment, knocked on the door, identified himself, and was let in by complainant. Defendant testified that complainant was wearing a baby doll nightgown and had a scarf wrapped around her hair. Complainant asked defendant what he was doing out so late and defendant responded that he had been "out on the town." Defendant denied telling complainant that his wife was ill.

Defendant told complainant that she "looked good" and "walked over to her and embraced her." He started kissing her around the ears and neck and told her that he wanted to make love to her. Complainant did not say anything and they went to the bedroom.

Defendant undressed while complainant got on the bed. They had oral sex and later had intercourse. Complainant did not protest or tell defendant to leave. According to defendant, he did not strike her and she never screamed. Defendant stated that it was complainant who initiated the oral sex and that the sexual acts were a "mutual thing."

After defendant dressed, they went into the living room. They had a discussion about Matthew and defendant told her that she was mistreating her son and should take better care of him. Complainant became upset and started "raising her voice." The son, apparently awakened by the loud conversation, came into the hallway. Complainant denied neglecting Matthew and told her son to go back to bed and also told defendant to leave. Defendant stated that he never threatened Matthew and did not threaten to strike complainant in the son's presence. Defendant left the apartment at approximately 5 a.m. and went home. He fell asleep on the couch and was later awakened by his wife. At approximately 7:30 in the morning, Matthew came over to defendant's house to get his bicycle out of the garage.

Michael Unruh testified that he lived in an apartment which was situated "just across a landing" from complainant's apartment. Mr. Unruh was home on the night of the incident and had gotten out of bed between 3:30 and 4 a.m. to get a drink of water. He did not hear any "loud voices" or screaming and added that his apartment was only seven feet from complainant's.

Vickie Dawson testified that she lived in the apartment directly underneath the apartment occupied by complainant. She was asleep at home on October 11, 1977, and did not hear any "outcries" or "commotion above her room." She added that in the past she had been able to hear sounds of people walking and other types of noises from complainant's apartment.

On appeal, defendant contends first that the State failed to prove him

guilty of rape, deviate sexual assault and intimidation beyond a reasonable doubt. In support of his position, defendant argues that the evidence presents a case of consensual sexual activity and further argues that complainant's testimony lacks plausibility where the neighbors did not hear her scream, where the individual, whom complainant called immediately following the incident, was not called to testify, and when she did not report the incident to police until after 10 o'clock in the morning.

■■ To prove a charge of rape, the State must show that intercourse was committed by force and against the will of the female. (Ill. Rev. Stat. 1977, ch. 38, par. 11—1; *People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211.) To sustain a conviction for deviate sexual assault, there must be evidence that defendant, by force or threat of force, compelled another to perform or submit to any act of deviate sexual conduct. (Ill. Rev. Stat. 1977, ch. 38, par. 11—3.) For both rape and deviate sexual assault, the testimony of a single witness, if positive and credible, is sufficient to support a conviction even though the accused contradicts the testimony of the witness. (See *People v. Chaney* (1977), 48 Ill. App. 3d 775, 362 N.E.2d 1375; *People v. Sweeney* (1977), 46 Ill. App. 3d 858, 361 N.E.2d 344.) Where a conviction for either offense is based upon the testimony of the complainant, it must be clear and convincing or otherwise corroborated by other evidence. See *People v. Williams* (1977), 54 Ill. App. 3d 848, 368 N.E.2d 1109; *People v. Wilcox* (1975), 33 Ill. App. 3d 432, 337 N.E.2d 211.

■■ Applying these principles, we believe the evidence was sufficient to prove defendant guilty of rape and deviate sexual assault beyond a reasonable doubt. It has long been held that it is the function of the jury to weigh the evidence and judge the credibility of witnesses and that a reviewing court will not reverse a conviction based upon conflicting evidence unless the evidence is so unreasonable or improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Sweeney.*) It was well within the province of the jury to believe complainant's narrative of the events in question. Her testimony presented a plausible explanation of the incident, which testimony, we believe, was clear and convincing, and was, in any event, corroborated in part by her son's testimony, her telephone call to the women's center, her obvious emotional distress and her refusal to return to her apartment. While defendant presented evidence in an attempt to negate complainant's testimony, such as the neighbors not hearing any screams, it did not render her narrative so improbable as to raise a reasonable doubt of defendant's guilt. The jury had the opportunity to hear this evidence along with all other evidence and determine its proper weight. Further, the evidence most damaging to

the State's case, the fact that the neighbors did not hear complainant's screams, is of little consequence when the neighbors also did not hear the argument between defendant and complainant concerning the care of the child as presented by defendant's testimony. Furthermore, it was not established that the neighbors were not in bed, asleep, when the outcries were made. We therefore hold that the evidence was sufficient to support a conviction for both rape and deviate sexual assault. In addition, we also believe that defendant was proven guilty of intimidation beyond a reasonable doubt. As provided in part by subsection (a) of section 12—6 of the Criminal Code (Ill. Rev. Stat. 1977, ch. 38, par. 12—6):

> "A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he communicates to another a threat to perform without lawful authority any of the following acts:
>
>> (1) Inflict physical harm on the person threatened or any other person or on property; or
>> (2) Subject any person to physical confinement or restraint * * *."

As the jury resolved the various factual questions concerning consensual sexual activity against defendant, it is clear that the evidence was sufficient to support this charge.

Defendant contends next that the trial court erred in granting the State's motion *in limine* to preclude any testimony relating to an alleged abortion had by complainant. Defendant intended to present evidence at trial that complainant had confided in defendant regarding a pregnancy and her desire to have an abortion. The purpose of this testimony, defendant argues, was to illustrate the close personal relationship existing between defendant and complainant and to help establish the defense of consent.

● 3 Our review of the record convinces us that defendant sought admission of this evidence more to arouse the emotions of the jury than to demonstrate a close personal relationship. Testimony on this subject would have little probative value, especially where there was ample evidence in the record that defendant and complainant were "very close" friends. The trial court therefore properly excluded this evidence which was cumulative in nature (*People v. Godbout* (1976), 42 Ill. App. 3d 1001, 356 N.E.2d 865) and which would serve to arouse prejudice in the minds of the jurors. (See *People v. Allen* (1975), 27 Ill. App. 3d 1054, 327 N.E.2d 387.) Furthermore, the admission of testimony regarding complainant's possible abortion would violate Illinois' long standing prohibition of allowing so-called specific acts of immorality on the part of the victim into evidence. See Ill. Rev. Stat., 1978 Supp., ch. 38, par. 115—7(a);

*People v. Collins* (1962), 25 Ill. 2d 605, 186 N.E.2d 30, *cert. denied* (1963), 373 U.S. 942, 10 L. Ed. 2d 697, 83 S. Ct. 1551; *People v. Griffin* (1966), 76 Ill. App. 2d 326, 222 N.E.2d 179.

Defendant also argues that he was denied a fair trial when the prosecutor, during the cross-examination of defendant, repeatedly asked him whether complainant and her son had lied on the stand. The State responds and we agree that defendant has waived this issue on appeal by making no objection at trial and by failing to raise it in his post-trial motion. Even if we were to consider the issue not waived, it is clear that any error associated with this cross-examination was harmless. We agree with defendant that it is improper for the prosecution to ask an accused his opinion of the veracity of other witnesses. (See *People v. Castillo* (1976), 40 Ill. App. 3d 413, 352 N.E.2d 340; *People v. Meeks* (1973), 11 Ill. App. 3d 973, 297 N.E.2d 705, *cert. denied* (1974), 418 U.S. 905, 41 L. Ed. 2d 1153, 94 S. Ct. 3196.) But we fail to see how defendant was prejudiced by this cross-examination when in response to the prosecutor's questions whether the son and complainant had lied, defendant stated: "Sir, I hesitate to call anybody a liar," and, "Again, sir, I only stated the facts * * *" and "That's for the jury to decide whether they believe my testimony or his [Matt's] testimony." Defendant refused to accept the prosecutor's challenge to invade the province of the jury and apparently took advantage of this line of questioning by exercising restraint and discretion.

Defendant also assigns as error the trial court's decision to grant the State's motion *in limine* to preclude the introduction of evidence as to complainant's reputation for chastity. Defendant was prepared to present the testimony of an individual who would have stated that he lived in the same community as complainant and knew that she had a reputation for being unchaste and immoral. Defendant argues that the enactment of the so-called Illinois rape shield statute (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 115—7) does not vary the long-standing Illinois rule that in rape cases, where a defendant offers a defense of consent, it is proper to introduce evidence of the complaining witness' general reputation for immorality and unchastity. (See *People v. Allen* (1919), 289 Ill. 218, 124 N.E. 329; *People v. Collins.*) Defendant asserts in the alternative that if we interpret this statute as precluding this type of general reputation evidence, then it must be held unconstitutional because it would foreclose defendant from using evidence material and relevant to the issue of the defense of consent and probative of his innocence. Defendant adds that a "blanket rule" regarding the admissibility of this general reputation evidence is also unconstitutional because it precludes a judicial determination of the relevancy of this evidence on a case-by-case basis and thereby prevents a

balancing of defendant's right to a fair trial and to confront witnesses with the State's interest in preventing harassment of the complainant.

Subsection (a) of the rape shield statute provides:

"In prosecutions for rape or deviate sexual assault, the prior sexual activity or the reputation of the alleged victim is inadmissible except as evidence concerning the past sexual conduct of the alleged victim with the accused." (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 115—7.)

A reading of the above statute reveals that the legislature clearly and unequivocally abrogated the old Illinois rule permitting reputation evidence of the complainant's chastity and immorality as it pertained to the issue of consent. (See *People v. Dorff* (1979), 77 Ill. App. 3d 882, 396 N.E.2d 827.) The express language of the rape shield law precludes the admission of evidence of prior sexual activity and reputation of the complainant except when it concerns the past sexual conduct of complainant with the defendant. Accordingly, the proposed testimony offered by defendant concerning complainant's unchaste reputation falls within this express statutory prohibition.

Defendant's characterization of the statute as being unconstitutional is likewise without merit. Although defendant fails to specify on what grounds the statute is constitutionally infirm, it appears that he challenges it as a violation of due process and his right to confront his accusers.

Defendant's right of confrontation necessarily includes the right to cross-examine witnesses, but that right does not extend to matters which are irrelevant and have little or no probative value. Complainant's past sexual conduct has no bearing on whether she has consented to sexual relations with defendant. The legislature recognized this fact and chose to exclude evidence of complainant's reputation for chastity as well as specific acts of sexual conduct with third persons in cases of rape and sexual deviate assault. The exclusion of this evidence does not prevent defendant from challenging or attacking complainant's credibility or veracity or otherwise utilizing cross-examination as an effective tool of impeachment. It merely denies defendant the opportunity to harass and humiliate the complainant at trial and divert the attention of the jury to issues not relevant to the controversy. At the same time, it provides an effective law enforcement tool by encouraging victims of rapes and other sexual assaults to report these crimes to the proper authorities without fear of having the intimate details of their past sexual activity brought before the public. The legislature was acting well within its powers in enacting reasonable legislation intended to eliminate the cruel and abusive treatment of the victim at trial by precluding the admission of prejudicial and irrelevant material and to promote the lawful

administration of the criminal justice system. This finding is consistent with the holdings in other jurisdictions in which a defendant has attacked the constitutionality of rape shield laws. (See, *e.g.*, *Roberts v. State* (1978), ___ Ind. ___, 373 N.E.2d 1103; *Finney v. State* (1979), ___ Ind. App. ___, 385 N.E.2d 477; *Smith v. Commonwealth* (Ky. 1978), 566 S.W.2d 181; *People v. Thompson* (1977), 76 Mich. App. 705, 257 N.W.2d 268; *Cameron v. State* (Okla. Crim. App. 1977), 561 P.2d 118; *People v. Blackburn* (1976), 56 Cal. App. 3d 685, 128 Cal. Rptr. 864.) We therefore hold that the Illinois rape shield law does not violate defendant's right to due process or deprive him of his right to confront his accusers.

Defendant contends next that the trial court erred in allowing impeachment of defendant with two prior convictions because, in his opinion, the probative value of this evidence was substantially outweighed by its prejudicial impact. (See *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) Defendant was convicted in 1951 of robbery and released from prison shortly thereafter. In 1953, he was convicted of rape and two armed robberies. He was discharged in 1965 for the rape conviction; discharged in 1969 for one of the 1953 armed robbery convictions; and at the time of trial, was on parole for the other 1953 armed robbery conviction, having been released from prison on the conviction in 1974. The State conceded that the rape and robbery convictions were inadmissible because more than 10 years from the dates of release on these offenses had elapsed, but urged the admission of the two other convictions. Following lengthy arguments presented by counsel concerning the application of *Montgomery*, the trial court agreed with the State and allowed the two convictions for armed robbery to be placed into evidence. In reaching its decision, the court acknowledged that there is always some prejudice to defendant when prior convictions are admitted.

■■ It is defendant's contention on appeal that the trial court did not weigh the prejudicial and probative value of the two 24-year-old convictions, but allowed them into evidence merely "because they fit within the technical time frame limits of *Montgomery*." Defendant's contention is without merit. Under the rule set forth in *Montgomery*, the trial court has broad discretion within certain specified limitations in deciding whether to admit evidence of prior convictions for purposes of impeachment. Illinois cases indicate that there is no requirement for the trial court to articulate all reasons justifying its decision so long as it is readily apparent from the record that there was an adequate basis upon which the trial court exercised its discretion. (*People v. Washington* (1973), 55 Ill. 2d 521, 304 N.E.2d 276; *People v. Owens* (1978), 58 Ill. App. 3d 37, 373 N.E.2d 848.) In both *Owens* and *Washington*, the trial court failed to specify the factors it considered in making a decision to admit a

prior conviction for impeachment. Yet the supreme court in *Washington* and the appellate court in *Owens* upheld the trial court's decision where the record established the trial court's familiarity with *Montgomery* and awareness of the potential dangers of the introduction of prior convictions. Although it would be preferable for the trial court to make an affirmative statement regarding the details of his decision, we believe the absence of such a statement was not fatal in the instant case where the court, as in *Washington* and *Owens*, was cognizant of and gave consideration to the applicable law and was aware of the possible prejudice to defendant. Counsel argued at great length concerning the various factors set forth in *Montgomery* and how the *Montgomery* rule should or should not be applied. Following these lengthy discussions, the trial court agreed with the State that the rape conviction was too remote under *Montgomery* but admitted the two armed-robbery convictions. It also stated that it recognized the potential prejudice any time a prior conviction is introduced into evidence.

● 9, 10 While it is apparent that the trial court had an adequate basis upon which to make its decision, at the same time, the record discloses no indication that the trial court abused its discretion in admitting the prior convictions. The fact that the trial court admitted the 24-year-old convictions does not conclusively establish the trial court's failure to conduct a "balancing test" as required by *Montgomery*. It was one factor to be considered along with such other factors as the nature of the prior crimes, the length of the criminal record, the age and circumstances of defendant, and the similarity of the crime to the one charged. (*People v. Montgomery*.) The trial court, in the exercise of its sound discretion, could reasonably have decided that the probative value of admitting the armed-robbery convictions outweighed any prejudice to defendant. Armed-robbery convictions have long been viewed as reflecting upon a defendant's credibility as a witness. (*People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336.) While the convictions in the present case were 24 years old, the trial court could have determined that they were not too remote in time where defendant was placed on parole only four years prior to trial. Furthermore, the trial court could reasonably have considered the length of defendant's criminal record in deciding whether to admit the two armed-robbery convictions for impeachment purposes. Accordingly, we cannot conclude that the trial court abused its discretion.

Defendant argues next that he is entitled to a new sentencing hearing because the trial court misinterpreted section 5—5—3.2(b) of the revised Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b)) in imposing an extended term of imprisonment and because the court improperly considered defendant's alleged perjury at trial in enhancing the sentence. In relevant part, section 5—5—3.2(b) of

the Unified Code of Corrections provides that an extended term may be imposed:

"(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the *same or greater class felony,* within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts." (Emphasis added.) Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b).

■■ Defendant's prior convictions relevant to this issue were his convictions for armed robbery in 1953. At that time, there were no class designations for the various felonies. It was not until the adoption of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—1 *et seq.*) that various classes of crimes were established nor until February 1, 1978, that armed robbery, rape and deviate sexual assault, all Class 1 crimes as of 1973, were elevated to Class X felonies. It is therefore defendant's contention that an extended term is improper because his current convictions for rape and deviate sexual assault were not preceded by a conviction "of the same or greater class felony" as required by section 5—5—3.2(b)(1). This precise issue was addressed at length in our recent case of *People v. Butler* (1979), 78 Ill. App. 3d 809, 396 N.E.2d 1374. There we held that the class of felonies for purposes of section 5—5—3.2(b)(1) were to be determined as of the effective date of the revised Unified Code of Corrections, February 1, 1978. We find no justification to deviate from this well-reasoned decision and therefore hold that armed robbery is "of the same or greater class felony" as rape and deviate sexual assault.

Defendant's contention that the trial court enhanced his sentence because of his alleged perjury at trial is likewise without merit. At the sentencing hearing, the trial court reviewed defendant's criminal record and noted that the crimes committed were of "great gravity, great magnitude." The court indicated that defendant's denial of the crimes "indicates that he does not have a contrite heart" and that "he is not sorry or remorseful in any way." The court added:

"He states rather boldly in Court that it was all with consent. The jury did not believe him apparently. They found otherwise. For the purpose of protecting the womanhood of society, Mr. Cornes should be incarcerated."

In imposing sentence, the court stated that it also considered the effect of the crime upon the victim.

■■ A careful reading of the sentencing hearing transcript reveals that the trial court never stated that it was enhancing defendant's sentence because he committed perjury at trial. The imposition of the sentence was based predominately, if not entirely, upon defendant's serious criminal

record, the need for protecting society, the effect of the crimes upon the victim, and a consideration of defendant's character and potential for rehabilitation. While defendant correctly notes that it is improper for a trial court to impose an additional penalty upon a defendant because of its belief that a defendant committed perjury (see *People v. Greenlee* (1976), 44 Ill. App. 3d 536, 358 N.E.2d 649), no such unlawful enhanced penalty was imposed in the present case.

Defendant's counsel and defendant's *pro se* briefs raise other issues clearly lacking in merit and which require no further discussion. For the reasons stated, the judgment of the Circuit Court of Williamson County is affirmed.

Affirmed.

KASSERMAN and SPOMER, JJ., concur.