789 A.2d 173 (2002)
347 N.J. Super. 219
STATE of New Jersey, Plaintiff-Respondent,
v.
T.C., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted November 7, 2001.
Decided February 4, 2002.
*175 Peter A. Garcia, Acting Public Defender, attorney for appellant (Abby P. Schwartz, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, attorney for respondent (Christine A. Hoffman, Deputy Attorney General, of counsel and on the brief).
Before Judges WEFING, LESEMANN and PARRILLO.
*174 The opinion of the court was delivered by LESEMANN, J.A.D.
Defendant T.C. appeals from her conviction and resultant sentence to ten years in prison, with five years of parole ineligibility, for endangering the welfare of her child, Billy.[1] The indictment of T.C. refers to the period between July 1, 1995, when Billy was nine years old, and November 6, 1996, when he was eleven years old. It charges that T.C. caused "harm" to Billy, making him "an abused or neglected child." The evidence presented at a lengthy trial included proof of a long course of sadistic, violent abuse, both physical and mental, which occurred not only during the period covered by the indictment, but also before that, when T.C.'s pattern of abuse included food deprivation which stopped only when Billy's grandmother assumed his custody and cared for him for approximately five years. Thereafter, when Billy was returned to his mother, the pattern of abuse resumed and intensified to an almost daily occurrence until Billy was finally removed from T.C.'s custody in November 1996.
The evidence against defendant was overwhelming. It included testimony from Billy's grandmother, his sister, his father, *176 a friend and neighbor to whom defendant described her abuse of Billy, two of the boy's teachers, and a surreptitiously made tape on which defendant virtually boasted of the abuse she heaped upon her son. Particularly in the light of that evidence, we find that none of the errors charged by defendant constituted prejudicial error requiring a reversal of her conviction and sentence.
Billy was born on June 19, 1985. While he was quite young, his paternal grandmother, A.P., became concerned about his extremely low weight. She also noted an early manifestation of the different treatment which defendant accorded to her two daughters and to Billy. Those daughters, one a year older than Billy and one a year younger, were allowed to eat additional foods when they visited their grandmother, but Billy was not. Any food which A.P. attempted to give Billy was removed by defendant, who contended that the foods made him ill. A.P. complained more than once to the Division of Youth and Family Services (DYFS) about Billy's condition, and eventually, in January 1990, DYFS had him hospitalized, removed from his parents' care, and placed in foster care. Thereafter, he was placed with A.P., and she cared for him for approximately five years. She testified that she fed him normally and plentifully, and his underweight problem soon disappeared.
In or around July 1995, Billy spent a weekend with his parents, after which they refused to return him to his grandmother. Although A.P. complained to DYFS, the agency determined that Billy should be returned to his parents on a permanent basis. He was then ten years old.
According to the testimony of Billy and his older sister, J., there was no significant abuse during the first month or two following Billy's return. Thereafter, however, the pattern of abuse resumed and intensified until Billy's final removal from his mother's custody in November 1996. J., who was fifteen years old at the time of trial, testified that her mother treated Billy very differently from the way she treated her two daughters. Billy testified to the same effect. J. said that Billy was often prohibited from eating dinner with the rest of the family. He would often go to school without lunch or breakfast. Billy himself testified that he was almost never permitted to eat with the family.
Billy and J. also said that Billy was hit on a regular basis, and the intensity and number of beatings increased over time. By November 1996, the beatings were "on a daily basis." They came as a result of Billy not doing his chores correctly, or saying something wrong or "just whatever she could blame him for." Defendant encouraged her daughters to tell her if Billy had done anything wrong. For any such offense, he was beaten, and the beatings often involved a belt or a spoon which defendant used to hit Billy on the head. J. was aware of that because her mother would often tell J. to bring her the spoon or the belt to administer the beatings.
Billy also described the increased intensity of the beatings administered by his mother. He said it "started as just her hands, and then it gradually went up to a belt." She would hit him "two or three times with it," and then she took to using a different type of belt, "a suede braided belt." She also increased the number of blows per beating, which "started as maybe just one, and it got up to" sometimes six blows per beating. The beatings were on an almost daily basis for approximately three months before he was removed from defendant's custody on November 7, 1996.
A bell which defendant installed on the door to Billy's room was a prominent subject of testimony at trial. Billy apparently *177 had a bed-wetting or similar problem controlling his urination. Defendant also believed that on one occasion, he had taken one of her pills for himself. As a result, defendant installed a bell alarm on Billy's door so she would hear him whenever he opened the door. At one point, she also locked his bedroom door. If she heard Billy's door open during the night, she would beat him as punishment in the morning. To try to solve the problem of not being permitted to go to the bathroom at night, Billy at one point began urinating out his window. Defendant found out about that and sealed the window. Billy then attempted to smuggle plastic bags into his room and urinate in the bags. Defendant found those as well and on each occasion punished Billy. Eventually, Billy took to urinating in his room. That led, of course, to unpleasant odors and to defendant's determination that Billy could not put his smelly clothing into the family washing machine. Billy was thus required to either wash his clothes in a basin in the front yard of the house-so that others would see him and be aware of his problem-or use his own time and money to go to a laundromat and wash his clothes. His need to do that caused him to break his perfect attendance record at school an approach to Billy's schooling that was consistent with other manifestations of defendant's feelings toward and treatment of her son: although he was a "straight A" student, she denied him opportunities to participate in extracurricular, honor programs for no apparent reason other than a general accusation of bad behavior.
K.M. was a neighbor and friend of defendant. Her testimony and the tape she made of defendant's comments about Billy, also played a prominent role at trial. K.M. testified to defendant's constant disparagement and almost obscene criticisms of her son. Among the milder epithets she applied to him were "faggot," "pig," "slob," "animal," and a "piece of" excrement she could not stand to look at. According to K.M., defendant frequently described her son's allegedly disgusting behavior and the punishments she inflicted upon him. K.M. became so upset by this pattern that she contacted DYFS in an attempt to have that agency investigate the situation. She was initially unsuccessful, but she continued her efforts until she presented DYFS with a tape she had made of a conversation in which defendant demonstrated her contempt for Billy and described her sadistic activities toward him. Among other comments on that tape, interspersed with defendant's expressions of amusement and/or pleasure, was her describing hitting Billy so hard that "his feet come up off the (expletive) floor." She described putting him "in his room for (expletive) weeks." She said he had been "grounded" ninety percent of the time, and she also called him a "creeping little (expletive) boy," "this thing," and said he was not "human." She described, with some apparent amusement, how on one occasion she had told Billy she was going to beat him with a belt after dinner, and, "You never seen a kid eat so (expletive) slow in your life ... he was that upset. He's out there while he was eating dinner he was shaking. So at least he's got some kind of (expletive) fear in him anyway." And, she said, referring to a beating she had administered, his "little ass should be purple again tomorrow." She also spoke of several other "ass whippings," saying she would have Billy drop his pants so there would be no padding and she could hit his "bare ass."
The tape presented by K.M. induced DYFS to proceed, and an agency representative then spoke to Billy. An examination of his buttocks and thighs showed reddish-purple, raised welts consistent with the use of "a strap."
*178 In addition to her testimony about defendant's comments, K.M. also described her observations. On at least two occasions, she saw defendant "backhand" Billy in the face with such force that it moved him backwards. She also described defendant's visits to her house, when defendant and her daughters would come into the house while Billy was made to stay outside, in the car.
Perhaps as significant as the specific events described on the tape, was defendant's constant insulting and degrading description of her son, whom she seemed to regard as almost sub-human. As noted, that pattern and overall treatment was confirmed by Billy, his older sister, his grandmother and K.M. Additional confirmation of some of the allegations was provided by school authorities and by Billy's father. In her own defense, defendant either denied the incidents or claimed they were exaggerated, justified, or both. She presented some additional witnesses who said they had not seen defendant engage in abusive or sadistic behavior toward her son. The evidence against her, however, was more than overwhelming.
On appeal, defendant makes the following arguments:
POINT I

N.J.S.A. 2C:24-4A IS VIOLATIVE OF THE RIGHT TO DUE PROCESS BECAUSE PURSUANT TO IT, CONDUCT WHICH IS DEFINED WITHIN THE STATUTE ITSELF AS A FOURTH-DEGREE CRIME MAY BE, AND IN THE INSTANT CASE WAS, PROSECUTED AS A SECONDDEGREE CRIME. U.S. CONST., AMEND. XIV; N.J. CONST. (1947), ART. I, PAR. 10. (Not Raised Below.)
POINT II
THE ADMISSION INTO EVIDENCE OF OTHER CRIMES OR BAD CONDUCT EVIDENCE, WHICH INCLUDED TESTIMONY THAT BILLY HAD BEEN STARVED BY DEFENDANT PREVIOUSLY AND REMOVED FROM HER HOUSE, SEVERELY PREJUDICED THE DEFENDANT AND DENIED HER HER STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL. U.S. CONST. AMENDS. VI AND XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9 AND 10. (Partially Raised Below.)
POINT III
DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS COUNSEL PUT EXTREMELY PREJUDICIAL PHOTOGRAPHS BEFORE A WITNESS AND THESE PHOTOGRAPHS WERE ULTIMATELY MOVED INTO EVIDENCE BY THE STATE. (Not Raised Below.)
POINT IV
THE PROSECUTOR IMPROPERLY CROSS-EXAMINED THE DEFENDANT BY ATTEMPTING TO COERCE HER TO CHARACTERIZE KEY STATE WITNESSES AS LIARS, IN VIOLATION OF HER RIGHT TO A FAIR TRIAL. (Not Raised Below.)
POINT V
THE COURT'S INSTRUCTIONS ON THE OFFENSE OF ENDANGERING THE WELFARE OF A CHILD WERE INSUFFICIENT AND DEPRIVED DEFENDANT OF HER RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW. U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9 AND 10. (Not Raised Below.)
POINT VI
THE FAILURE TO REQUIRE THAT THE JURY MAKE A SPECIFIC FINDING ON THE CHARGE OF ENDANGERING *179 THE WELFARE OF A CHILD, AS TO THE DEFENDANT'S CONDUCT, CAUSED THE POTENTIAL OF A NON-UNANIMOUS PATCHWORK VERDICT IN VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS. U.S. CONST. AMENDS. VI AND XIV; N.J. CONST. (1947) ART. I, PAR. 1. (Not Raised Below.)
POINT VII
THE SENTENCE IMPOSED IS EXCESSIVE AND IS UNSUPPORTED BY THE STATUTORY AGGRAVATING AND MITIGATING FACTORS.

I
Defendant's first argument asserts that the statute under which she was convicted, N.J.S.A. 2C:24-4a, is substantively indistinguishable from N.J.S.A. 9:6-3. Since the former represents a second degree offense and the latter a fourth degree offense, her claim is that this duplication vests the prosecutor with an unconstitutionally broad discretion to choose one rather than the other. However, we are satisfied that, while the prosecutor does have a broad discretion to determine under which of those two statutes to proceed, that fact does not lead to a conclusion that N.J.S.A. 2C:24-4a is unconstitutional.
First, it is clear that a prosecutor is vested with broad discretionary powers regarding the decision to prosecute and the charges on which to base such a prosecution. See, e.g., State v. Hessen, 145 N.J. 441, 452, 678 A.2d 1082 (1996); State v. Hermann, 80 N.J. 122, 127, 402 A.2d 236 (1979). That discretion includes an initial decision as to sentencing exposure. See State v. Lagares, 127 N.J. 20, 27, 601 A.2d 698 (1992); State v. Todd, 238 N.J.Super. 445, 461, 570 A.2d 20 (App.Div.1990).
When the State is called upon to determine how to proceed in a given matter, it is certainly not unusual to find there is more than one applicable statute under which the prosecutor could proceed. In such a case when there are overlapping statutes, the applicable rule is clear: "When an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." United States v. Batchelder, 442 U.S. 114, 123-24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755, 764 (1979).
In sum, whether to prosecute and what charge to file or bring before a grand jury, are decisions that generally rest in the prosecutor's discretion. Ibid. Such an exercise of discretion is common, and defendant does not argue that, as a general proposition, the exercise of such discretion raises constitutional issues. Defendant does argue, however, that when there are two substantively identical statutes from which the prosecutor may make a choice, and the penalties available under the two are significantly different, there is a violation of equal protection or due process guarantees. That argument, however, was raised and squarely rejected in Batchelder, supra.
Batchelder involved two separate and distinct statutes, each of which prohibited a convicted felon from possessing a firearm which had been transported in interstate commerce. One of the statutes provided a maximum penalty of five years imprisonment. The other set the maximum punishment at two years imprisonment. The defendant was indicted for a violation of the former, and he was convicted and sentenced to the applicable five year term. He appealed, and the Court of Appeals reversed and remanded the matter for imposition of the lesser, two year sentence. United States v. Batchelder, 581 *180 F.2d 626, 631-34 (7th Cir.1978). That court held that the prosecutor's customary discretion to choose between "two overlapping statutes" did not apply when the two statutes had "identical substantive elements." The court expressed "serious doubts about the constitutionality" of those statutes and described the issue as posing "difficult constitutional questions." To avoid those issues and a possible determination of unconstitutionality, the court construed the statutes so as to require a resentencing under the more lenient provision.
The Supreme Court reversed. It found no constitutional infirmity. It noted what it described as the "long recognized" proposition that a prosecutor may exercise discretion to proceed under either of two overlapping statutes. 442 U.S. at 123-24, 99 S.Ct. at 2204, 60 L.Ed.2d at 764. And it found no distinction between that settled proposition and the situation presented in Batchelder, where the two statutes were substantively identical:
[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause.... Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution neither is he entitled to choose the penalty scheme under which he will be sentenced.
[442 U.S. at 125, 99 S.Ct. at 2205, 60 L.Ed.2d at 765-66.]
See also, citing and quoting extensively from Batchelder, State v. Kittrell, 145 N.J. 112, 128-30, 678 A.2d 209 (1996).
Thus, there is no constitutional infirmity in the State indicting and proceeding under N.J.S.A. 2C:24-4a, even though defendant's conduct might also constitute a violation of N.J.S.A. 9:6-3. The choice of the statute under which to proceed is nothing more than the normal type of discretionary decision vested in and exercised by prosecutors on an everyday basis.
The State correctly notes that the primary concern of Title 9 is the protection of children rather than the culpability of adults. See G.S. v. Dept. of Human Serv., 157 N.J. 161, 176, 723 A.2d 612 (1999); State v. Demarest, 252 N.J.Super. 323, 331, 599 A.2d 937 (App.Div.1991). See also Final Report of the New Jersey Criminal Law Revision Commission, Vol. II, at 259-60 (1971). The obvious purpose of adopting the newer N.J.S.A. 2C:24-4a was to permit prosecution for the more serious second degree offense when circumstances warrant. Ibid. There is no claim, nor any basis for a claim here, that the prosecutor acted arbitrarily in charging and prosecuting for a second degree offense. There is no un-constitutionality.

II
We are also satisfied that there was no error in the trial court's admitting evidence of defendant's wrongfully withholding food from Billy between his birth in 1985 and the time when he went to live with his grandmother in 1990, even though that time period was not covered by the indictment. We agree with defendant that the court's limiting instruction in that regard could have been more specific, but under the facts of this case, considering *181 what the court did include in its instruction, and also considering defendant's failure to object to any portion of the charge, or to request greater specificity, we find that any shortcoming in the instruction did not constitute prejudicial, reversible error.
The primary evidence on this point consisted of A.P.'s testimony, together with photographs showing the extent of the boy's malnutrition and his swift recovery after he began living with A.P. In addition, there were two brief references to this factor during trial: in one, a DYFS case worker noted that her investigation of the abuse that led to defendant's indictment had been affected by her knowledge that Billy had previously been removed from defendant's custody and placed with A.P. The second instance involved a teacher who testified (in answer to defense counsel's question) that she had not sought an explanation for Billy's frequent appearances without lunch, because she knew he had previously been removed from his mother's custody for a similar reason.
Prior to trial, the court held a hearing to review the pre 1990 evidence that was to be offered at trial. It heard arguments by both counsel and ruled that the evidence would be admitted under N.J.R.E. 404(b), with an appropriate limiting instruction. The court did provide such an instruction when A.P.'s testimony was first presented, provided another such instruction when the photographs were presented, and delivered yet a third instruction as part of the court's concluding charge to the jury.
N.J.R.E. 404(b) reads as follows:
Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
The State contended that the evidence of defendant's earlier mistreatment of her son showed her motive, intent, plan and knowledge, and the absence of any mistake or accident regarding her treatment of Billy. We are satisfied that those permitted purposes are clearly applicable here.
The evidence of defendant's treatment of Billy during the first five years of his life certainly tended to demonstrate her malice toward the boy, her intent to inflict harm upon him, her seemingly almost pathological hatred of him, and it did undercut her claim that her actions simply represented good faith attempts to impose reasonable discipline. The evidence was not proffered to show a general "disposition" to commit crimes or to show that defendant acted "in conformity" with such a disposition. Rather, it was presented for a specific, limited purpose, analogous to that in State v. Engel, 249 N.J.Super. 336, 372-74, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991), which involved, not the defendant's child, but his wife. There, evidence of defendant's prior abuse of the victim was held admissible to show defendant's "enduring hostility toward the victim" which was "important and material" as a "means to reach and disclose [the defendant's] secret design and purpose." Id. at 374, 592 A.2d 572. That reasoning applies here as well. The evidence of defendant's prior abuse while Billy was under five years old falls squarely within the permitted use of "evidence of other crimes [or] wrongs" under N.J.R.E. 404(b).
By itself, however, that analysis does not resolve the question of whether evidence of defendant's earlier mistreatment of Billy was properly admitted at trial. In State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 *182 (1992), the Supreme Court held that, even when evidence of prior wrongs falls within the permissive provisions of N.J.R.E. 404(b), the State must nevertheless satisfy a four-prong test before the evidence can be admitted.
1. The evidence of the other crime must be relevant to a material issue in the present proceeding;
2. The evidence of the prior offense must be similar in kind and reasonably close in time to the offense presently charged;
3. The evidence of the prior crime must be clear and convincing; and
4. The probative value of the evidence of the prior offense must not be outweighed by its apparent prejudice in the later proceeding. We are satisfied that the proposed evidence here met all of those criteria.
First, the evidence relating to defendant's malice was certainly relevant to a material issue in the present case: defendant's intent in inflicting on her son the physical and mental punishment so vividly described at trial. Indeed, that was, essentially, the critical issue in this case. Defendant maintained that she was acting only in good faith to impose reasonable discipline on her son. She asserted that she loved him and placed an alarm on his door only to protect him and that she had only disciplined him in moderation. It is difficult to conceive of any evidence that was more directly aimed at contradicting and undercutting that defense than evidence that defendant had deliberately withheld food from her son five years earlier, to such an extent that he was hospitalized and his custody transferred to his grandmother. The evidence showed earlier conduct that was as cruel and vindictive as the later actions charged in the indictmentactions aimed precisely at this same victim and, the State contended, motivated by the same malice.
The proffered evidence also met the second prong of the Cofield test, since the earlier acts were "similar in kind" and "reasonably close in time" to the offenses charged in the indictment. The acts were, in fact, so similar that they were, realistically, part of the same pattern of conduct. In terms of time, the apparent gap between the earlier incidents (between 1985 and 1990) and the later events of 1995 to 1996, was explainable by the obvious fact that during the intervening five years, Billy was not living with defendant, but was with his grandmother. Only in 1995, did defendant have an opportunity to resume her conduct, and, within a few months of Billy's return to her control, she proceeded to do precisely that.
The third prong of the Cofield test requires "clear and convincing" evidence of the prior acts. The evidence here met that description. The testimony of Billy's grandmother was clear and compelling. The photographs were equally compelling and both were corroborated at least to some extent by the supplemental testimony of the DYFS representative and Billy's teacher.
Finally, the question of whether potential prejudice inherent in testimony of earlier "bad acts" outweighs its probative value in a later trial, is generally a question committed to the discretion of a trial court. See State v. Marrero, 148 N.J. 469, 483, 691 A.2d 293 1997). Here, the trial court held a hearing to explore that issue. It considered the nature of the material and the manner in which it was to be presented. It heard arguments of counsel and weighed the potential prejudice versus the probative value of the evidence and reached a reasoned decision that the evidence should be admitted. As noted, that evidence went to the key issue in the case.
*183 It was presented in a non-inflammatory, fact-oriented manner, and there is no basis for our concluding that the trial judge's decision represented an abuse of discretion.
As to the court's limiting instruction, we note again that the instruction was presented in one form or another on three occasions. On all of those occasions, the court was emphatic in instructing the jury that it could not consider the evidence of the prior offenses as demonstrating some propensity or disposition of defendant to commit a crime, or evidence that she acted in accordance with that disposition in the present matter. Before the evidence was first submitted, the judge told the jury:
You cannot, and I instruct you accordingly, you must accept my instruction, you cannot view this evidence, and it is now admissible, for the purpose of proving that the defendant acted in conformity in the case that's before you based on the evidence or the testimony that you are about to hear. In other words, what you're about to hear will raise concerns about prior conduct of the defendant with regard to her relationship and care of her son. You may not consider for the purposes of concluding that if she did it then, she did it again now. It's not proof of that and may not be considered by you in any way, shape or form to serve as proof of that.
After repeating the substance of that instruction a second time during trial, in the court's final charge to the jury, it repeated that strong language:
... you may not use this evidence to decide that the defendant has a tendency to commit crimes or that she is a bad person. That is, you may not decide that just because the defendant has committed uncharged crimes, wrongs or acts, she must be guilty of the present crime .... you may not find the defendant guilty now simply because the State has offered evidence that she committed those other uncharged crimes, wrongs or acts.
Notwithstanding the clarity and force of the court's prohibitory instruction, however, the remainder of the instruction lacked the precision that it should have contained. As the Court noted in State v. G.S., 145 N.J. 460, 472, 678 A.2d 1092 (1996),
On admission of other-crime evidence, the court must not only caution against a consideration of that evidence for improper purposes, it must through specific instruction direct and focus the jury's attention on the permissible purposes for which the evidence is to be considered.
Here, the instruction lacked that required specificity. Rather, in detailing the proper purposes for which the evidence could be considered, the trial court engaged in what this court has described as "[a] mere recitation of the generalities of the rule," which failed to "narrowly focus the jury's attention on the specific use of the othercrime evidence...." State v. G.S., 278 N.J.Super. 151, 163-64, 650 A.2d 819 (App. Div.1994), aff'd, and quoted with approval, State v. G.S., supra, 145 N.J. at 472, 678 A.2d 1092. See also, on the need for a specific delineation of the proper purpose for which other-crime evidence is admitted, State v. Oliver, 133 N.J. 141, 157-58, 627 A.2d 144 (1993); State v. Cofield, supra, 127 N.J. at 337, 605 A.2d 230; State v. Stevens, 115 N.J. 289, 305, 558 A.2d 833 (1989).
However, even acknowledging that the instructions here failed to sufficiently specify and focus on the purposes for which the other crimes evidence was being admitted, it does not follow that the failure resulted in prejudice to defendant or requires reversal. As the Court noted in a comparable *184 situation in State v. G.S., supra, 145 N.J. at 473, 678 A.2d 1092,
The issue arises as one of plain error because defendant did not object to the trial court's instruction on the grounds of lack of specificity. R. 2:10-2. Plain error is reversible if it is "clearly capable of producing an unjust result." R. 1:7-2; R. 2:10-2. Accordingly, the test to apply is whether the possibility of injustice is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." (Quoting from State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).)
Here too, defendant raised no objection to the lack of specificity in the court's instruction, and thus our analysis parallels that in State v. G.S.
In G.S., the Court concluded that, "the deficiencies in the charge did not warrant reversal of defendant's convictions because the trial court had twice cautioned the jury against considering the other-crime evidence to prove defendant's disposition to commit the offenses with which he was charged," and it stressed that, "this cautionary instruction constituted the `essential point to be made in the limiting instruction.'" G.S., 145 N.J. at 473, 678 A.2d 1092. In addition, the Court found "other ample evidence of defendant's guilt" and, "[a]ccordingly, it determined that any error arising from a lack of clarity in the limiting instruction was harmless and not clearly capable of producing an unjust result...." Ibid. See also Stevens, supra, 115 N.J. at 309, 558 A.2d 833, cited and quoted with approval in G.S.
The reasoning in G.S. is applicable here. The court here stressed and made emphatically clear the "essential point to be made in the limiting instruction": that the othercrime evidence could not be used to demonstrate defendant's general disposition to commit the crimes with which she was charged. As noted, that instruction was delivered three times, emphatically.
Finally, as in G.S., there was overwhelming other evidence of defendant's guilt, from the testimony of defendant's victim, from her daughter, from the child's grandmother, and from the friend and neighbor who was so upset by defendant's actions that she submitted and then resubmitted her protestations to DYFS. And finally, there was indisputable independent additional evidence of guilt from defendant's own mouth via the tape made by K.M. For all those reasons, we are satisfied that any error in the court's failure to deliver as specific and precise a charge as it should have delivered, was harmless, was not clearly capable of producing an unjust result, and should not lead to a reversal. R. 2:10-2.

III
Defendant also seeks reversal on the grounds of alleged prosecutorial misconduct because of the prosecutor's asking her, on cross-examination, whether State's witnesses had been lying when they testified against her. There were a number of such questions directed at the various State's witnesses, in each of which the prosecutor asked defendant, in essence, whether a particular witness was "lying" when he or she described some action of defendant. Although we find no reported case in this state which criticizes or prohibits that form of cross-examination, we are satisfied that such questioning is inappropriate and should not be countenanced. See United States v. Richter, 826 F.2d 206, 208 (2d Cir.1987); Greenberg v. United States, 280 F.2d 472, 475 (1st Cir.1960); People v. Cornes, 80 Ill.App.3d 166, 35 Ill.Dec. 818, 399 N.E.2d 1346 (1980). However, while we agree that the prosecutor should have refrained from such questioning, *185 we do not find that the conduct constitutes a basis for reversing defendant's conviction.
First, we note that defendant objected to none of that questioning at trial. Thus, the appropriate standard of review is plain errora finding that the impropriety was clearly capable of producing an unjust result. R. 2:10-2. Defendant's failure to object suggests that her counsel did not believe the conduct was prejudicial and also made it impossible for the court to take timely curative action to ameliorate any adverse effect from the improper questioning. See State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999); State v. Ramseur, 106 N.J. 123, 323, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).
There was no showing of any such prejudice here. Nor can we see any basis for presuming prejudice. The prosecutor's questions concerned specific inconsistencies between the testimony of the defendant and that of the State's witnesses. The prosecutor did not act improperly in pointing out the inconsistencies; the impropriety lay only in the form used to develop the point. There was no misrepresentation or mis-characterization of anyone's testimony. The discrepancy between the testimony of defendant and that of the witnesses testifying for the State was clear and virtually self-evident. The prosecutor simply highlighted and emphasized those inconsistencies. He did not either emphasize or repeat defendant's responses during his summation. And, in its final instructions, the court clearly told the jury that it was the jury's responsibility to determine the credibility of witnesses.
Finally, we note defendant's reliance on an unpublished opinion of this court, State v. Haraz, Docket No. A-2397-92T4, (April 21, 1995). Since the opinion was unpublished, we will not discuss the case at length. Rather, we will simply note that while this court did find that questions similar to those employed here were improper, it ultimately reversed the defendant's conviction because of three separate and distinct forms of prosecutorial misconduct, and not simply because the prosecutor improperly asked defendant to characterize the testimony of the State's witnesses. We note also that in Haraz, the defendant had objected to the crossexamination, and thus there was no need to demonstrate plain error.

IV
Defendant also claims error in what she describes as the court's inadequate charge defining the offense of which she was accused. We find no merit in the claim.
The statute defendant was charged with violating, N.J.S.A. 2C:24-4a, employs broad, general terminology in describing the offense of endangering the welfare of children. As applied here, it refers to causing a child "harm that would make the child an abused or neglected child as defined in" N.J.S.A. 9:6-1, N.J.S.A. 9:6-3, and N.J.S.A. 9:6-8.21. Thus, to give further content to N.J.S.A. 2C:24-4a, one must obviously look at the cited provisions of Title 9. In delivering its charge to the jury here, the court did precisely that. After first setting out the introductory provisions of N.J.S.A. 2C:24-4a, (the defendant must have had a legal duty to care for the child in question), the court defined the critical element that the State must prove to establish guilt. In so doing, it quoted from and paraphrased the aforesaid provisions of Title 9 and delivered the following instruction:
The third element that the State must prove beyond a reasonable doubt is the defendant knowingly caused the child *186 harm that would make the child an abused or neglected child. Abused or neglected child means a child less than eighteen years of age whose parent or guardian, as herein above defined, inflicts upon such child physical injury, by other than accidental means, which causes or creates a substantial risk of protracted impairment of physical or emotional health.
Or, a child whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or guardian ... to exercise a minimum degree of care in supplying the child with adequate food, clothing, shelter, medical care ... or in providing a child with proper supervision or guardianship, by unreasonably inflicting harm or substantial risk thereof, including the infliction of excessive corporal punishment.
... [T]he law does not prohibit the use of corporal punishment. The statute prohibits the infliction of excessive corporal punishment. The general proposition is that a parent may inflict moderate correction such as is reasonable under the circumstances of a case.
Or by any other acts of a similarly serious nature requiring the aid of the court. Or, a child upon whom excessive physical restraint has been used under circumstances which do not indicate the child's behavior is harmful to himself, others or property.
So "abused or neglected child" has several "ors" in the definition. If you find beyond a reasonable doubt any one or more of those elements has been proven, then you have established that the childthat element, that the child is an abused or neglected child.
That definition is, as noted, generalized. However, there is no principle requiring that in every case a court must deliver a specifically tailored instruction relating the facts of the case to the applicable law. Such tailoring and specification is required only if necessary to avoid confusion or misunderstanding, or when the facts and legal concepts are complex and require such treatment. See State v. Concepcion, 111 N.J. 373, 379-80, 545 A.2d 119 (1988); State v. Morton, 155 N.J. 383, 422, 715 A.2d 228 (1998), cert. denied, 532 U.S. 931, 121 S.Ct. 1380, 149 L.Ed.2d 306 (2001).
Here, there is no claim that the court misstated the law. Nor was there a request by defendant for a more specific or tailored charge. Thus, once again, in order to show a basis for reversal, defendant must demonstrate plain error. See State v. Morton, supra. However, we see no error, "plain" or otherwise.
There was nothing particularly complex or confusing in the law submitted to the jury here. The definition of an abused or neglected child was cast in simple, uncomplicated language. The fact that the definition also employed generalized, non-specific language was virtually unavoidable given the nature and the language of the applicable statutes. As the State correctly argues, the law was relatively simple and the factual allegations were also uncomplicated. There is nothing extraordinary in calling upon a jury to decide a case based on concepts that employ terms such as "substantial," "serious," or "reasonable." Such terms and concepts are standard parts of our legal system and juries deal with them on a regular basis. In short, the court delivered an accurate and sufficient charge. There was no request for further detailing or tailoring, and there was no error.

V
Although defendant made no such request at trial, she claims now that the *187 court should have delivered to the jury a "specific unanimity charge." Her claim is that the jury was presented with three separate actions which could possibly have warranted a finding of guilt: first, that defendant hit Billy with a belt; second, that defendant restrained her son by installing an alarm system on the door of his room; and third, that she did not provide him with food. She argues that those three represent different and distinct violations and the need for juror unanimity requires that any guilty verdict must be based on all twelve jurors agreeing that she was guilty of at least one of those three different acts.
The State disagrees. It contends that a general unanimity charge was sufficient and there was no need for a "specific unanimity charge." It argues that the indictment charged, and the State demonstrated, that defendant had engaged in a continuing course of abusive conduct against Billy from July 1995 through November 1996, and that conduct made him an abused or neglected child. It claims that the various acts presented by the State were all related to that same abusive course of conduct; that the different acts were not "conceptually distinct" but rather were "conceptually similar" and included defendant's "emotionally and physically [abusing] ... Billy by degrading him through verbal insults, depriving him of food and other necessities, confining him to a small room that had an alarm system at night, and beating him with a belt and other objects severely enough to leave welts." The State describes those actions as "all parts of defendant's plan to abuse and torture" Billy. There was, it argues, "a single theory of emotional and physical abuse," which "was supported by related acts occurring over a period of time."
We agree with the State's argument. We are satisfied that the court's general unanimity charge was sufficient and there was no need for an additional "specific unanimity charge."
The difference between a case which requires a "specific unanimity charge" and one that does not, is apparent from comparing two cases: State v. Bzura, 261 N.J.Super. 602, 606-07, 619 A.2d 647 (App. Div.), certif. denied, 133 N.J. 443, 627 A.2d 1147 (1993), and State v. Parker, 124 N.J. 628, 633-35, 641, 592 A.2d 228 (1991), cert. denied, 503 U.S. 939, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992). In Bzura, an attorney was charged with two different violations of the false swearing statute. One accused him of making a specific false statement, contrary to N.J.S.A. 2C:28-2a, and the second accused him of making two inconsistent statements, contrary to N.J.S.A. 2C:28-2c. The matter was submitted to the jury without a specific unanimity charge, and the jury found defendant guilty of false swearing. On appeal, this court reversed, noting that without the specific unanimity charge, the jury might not have agreed as to which of the two offenses defendant had committed. Presumably, some jurors may have determined that defendant had committed one of the offenses and others may have made a similar determination with respect to the second charge, but there would not have been a unanimous verdict on either of the charges. This court concluded that the procedure followed would have permitted "individual jurors to agree on a guilty verdict based on such different factual predicates [as] would countenance a non-unanimous jury verdict." Id. at 615, 619 A.2d 647.
In Parker, a teacher was convicted of official misconduct involving three related allegations: first, that she had exhibited sexually explicit magazines to students; second, that she had caused her students to make collages from photographs in *188 those magazines; and third, that she had discussed her own and others' sexual proclivities with her students. Parker, 124 N.J. at 631-32, 592 A.2d 228. In that case, defendant had not requested a specific unanimity charge, and the trial court had delivered only the normal, general unanimity instruction. On defendant's appeal, the Supreme Court affirmed.
The Court concluded there had been no indication that the jury was confused by the charges, or that the allegations against defendant were contradictory or "only marginally related to each other." Id. at 639, 592 A.2d 228. Rather, the Court said, the indictment had charged that defendant was engaged "in a continuing course of conduct which sexually abused, humiliated and otherwise endangered the welfare of children while [she] had a legal duty to care for the children and had assumed responsibility for their care. The acts cited certainly formed a core of conceptuallysimilar acts relating to the students' educational relationship with the teacher and her abuse of that relationship." Ibid. The Court went on to quote with approval language from the Attorney General's brief which might well have been prepared with our present case in mind:
It is apparent that the acts ... allegedly committed by defendant are not conceptually distinct. All refer to conduct which can endanger a child, either physically or mentally. Abuse includes using obscene language in the presence of a child or performing any act or deed in the presence of the child which could debauch the child's morals. Humiliation includes making the victim feel degraded. Endangering the welfare of a child includes engaging in conduct that would render a child an abused or neglected child. The evidence in this case, ... clearly constituted abusive, humiliating conduct which "involved subjecting the victims to either active or passive participation in ... activity in a manner harmful to their physical or mental health.".... Because the acts alleged were conceptually similar, there was no reason to give a specific unanimity charge.
[Ibid.]
We are satisfied that here, as in Parker, there was no indication of juror confusion, nor were there two separate theories being submitted to the jury. There was but one theory of ongoing emotional and physical abuse over a period of time, which consisted of a number of "conceptually similar acts committed by the defendant." Accordingly, the general unanimity charge delivered to the jury was sufficient, and there was no need for the court to deliver a specific unanimity charge which was not requested by defendant.

VI
Defendant's claim that her sentence was excessive requires little discussion. The sentencing judge found five aggravating factors and no mitigating factors. He emphasized the "nature and circumstances" of the offense of which defendant had been found guilty. He described defendant's actions as "the torture and beating of her son," and pointed out that the occasions specified in the indictment were not the first times she had done that. The judge said he was "sickened by the facts as they were developed in this case." That description comes close to describing the likely reaction of anyone who has had any contact with this matter or who reviews the almost incomprehensible series of actions perpetrated by defendant.
There was ample basis for the court to find the five aggravating factors referred to: first, the nature and circumstances of the offense, N.J.S.A. 2C:44-1a(1); second, *189 the gravity and seriousness of the harm inflicted upon the victim, N.J.S.A. 2C:44-1a(2); third, the risk that defendant would commit another offense, N.J.S.A. 2C:44-1a(3); fourth, defendant's prior criminal record, N.J.S.A. 2C:44-1a(6); and fifth, the need to deter defendant and others, N.J.S.A. 2C:44-1a(9). Some of those factors were obviously more significant than others. Defendant did have a prior criminal record, but it was relatively minor. On the other hand, the nature and circumstances of the offense and the gravity and seriousness of the harm inflicted upon the victim, almost defy description and comprehension. Defendant's actions have been only summarized in this opinion. After reading the trial transcript, and particularly the tape in which defendant described her actions toward her son with her only emotions apparently being amusement and some form of pleasure, words like horrifying and despicable seem inadequate.
The judge also referred to the photographs taken of Billy when he was five years old and went to live with his grandmother because he had suffered from malnutrition while living with his mother. While defendant objects to the court's reference to defendant's earlier mistreatment, we are satisfied for all of the reasons discussed in Point II above, that the judge's reference to those prior acts was proper because of the light they provided on the later acts.
In State v. Roth, 95 N.J. 334, 363-64, 471 A.2d 370 (1984), the Supreme Court spoke of the broad discretion vested in a sentencing trial court, provided only that it proceeds within the parameters of the criminal code, and the resulting sentence is not one that "shocks the judicial conscience." There was no illegality here, nor does the sentence in any respect shock the judicial conscience of this court.

VII
Finally, we note defendant's argument that her constitutional rights were violated by reason of her not receiving adequate representation by counsel. On several occasions, the Supreme Court and this court have noted that such claims are generally better dealt with by way of request for post-conviction relief, where an appropriate record can be developed. We find that is true here, and thus we reject defendant's request for relief by reason of inadequate representation by counsel, but without prejudice to her seeking such relief by way of request for post-conviction relief. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987); State v. Preciose, 129 N.J. 451, 609 A.2d 1280 (1992).
We have considered the entire record in this case and all of the arguments submitted by defendant. To the extent that we may have omitted specific comment on or reference to one or more of the arguments submitted, we have done so, not because we have overlooked them, but rather because we have concluded that such arguments do not have sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).
Affirmed.
NOTES
[1] Because of the age of the child victim, the pseudonym "Billy" is used here rather than the child's real name. For the same reasons, others referred to herein are identified only by initials or false names.